# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                  **No. CR 22-1400 JB**

TROY DON TESTON,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed March 24, 2023 (Doc. 39)("Suppression Motion").  The Court held an evidentiary hearing on April 20, 2023.  See Clerk's Minutes at 1, filed April 20, 2023 (Doc. 71)("April 20 Clerk's Minutes").  The primary issue is whether New Mexico State Probation Officer Brendon Osborn had reasonable suspicion to search Defendant Troy Don Teston's truck during Teston's October 5, 2020, probation appointment in Portales, New Mexico.  The Court concludes that Osborn had reasonable suspicion to search Teston's truck, because: (i) Osborn saw, in plain view, a carbon dioxide ("$CO_2$") canister in Teston's truck, suggesting the presence of firearms; (ii) Teston was unable to produce a drug test saliva sample for twenty minutes, suggesting the use of drugs, possibly while operating a vehicle; and (iii) Teston's subsequent urine analysis test produced (a) an inconclusive result for methamphetamine, which a laboratory did not report to be negative until after Teston's truck's search, which raised the possibility of his using methamphetamine and (b) a positive result for marijuana, which raised the possibility of his driving under the influence of marijuana.  Accordingly, the Court denies the Suppression Motion.

**FINDINGS OF FACT**

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. The United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States of America do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he Supreme

_____

[1]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value

Court has made it clear hearsay is admissible in suppression hearings . . . . As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

1.      **Teston's Probation Terms.**

1.      Osborn is a probation officer for the New Mexico Probations Department.  See Draft Transcript of April 20, 2023 Hearing at 32:7-10 (taken April 20, 2023)("April 20 Tr.")(Armijo, Osborn).[2]

2.      Osborn serves as Teston's probation officer.  See April 20 Tr. at 32:11-16 (Armijo, Osborn).

3.      On February 3, 2020, Teston received a suspended sentence for possession of a controlled substance.  See April 20 Tr. at 32:24-33:4 (Armijo, Osborn); Amended Judgment, Sentence, and Order Suspending Sentence at 1, filed April 14, 2023 (Doc. 49-1)(admitted on April 20, 2023, at the suppression hearing as United States Ex. 1)("Amended Judgment").

---

with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo, United States v. Blake, 284 F. App'x 530 (10th Cir. 2008), United States v. Stewart, 273 F. App'x 768 (10th Cir. 2008), and United States v. Reed, 195 F. App'x 815 (10th Cir. 2006), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

4.     In connection with his suspended sentence, Teston received an Order of Probation, which Teston signed on February 7, 2020.  See April 20 Tr. at 33:5-19 (Armijo, Osborn); Order of Probation at 1-3 (dated February 7, 2020), filed April 14, 2023 (Doc. 49-2)(admitted on April 20, 2023, at the suppression hearing as United States Ex. 2).

5.     The Order of Probation required Teston not to violate the laws of the State of New Mexico or any other jurisdiction.  See Order of Probation ¶ 1, at 1; April 20 Tr. at 33:20-25 (Armijo, Osborn).

6.     The Order of Probation required Teston not to "buy, sell, own or have in [his] possession, at any time, firearms, ammunition, or other deadly weapons."  Order of Probation ¶ 8, at 2.  See April 20 Tr. at 34:1-13 (Armijo, Osborn); id. at 48:11-15 (Osborn, Taylor).

7.     The Order of Probation permitted Osborn to search Teston's "person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of [Teston's] conditions of probation."  Order of Probation ¶ 6, at 1.  See April 20 Tr. at 34:14-25 (Armijo, Osborn).

8.     Before his October 5, 2020, probation appointment, Teston tested positive for methamphetamine in August, 2020.  See April 20 Tr. at 57:5-20 (Court, Armijo, Osborn, Taylor).

**2.     Teston's October 5, 2020, Probation Appointment.**

9.     Osborn was serving as Teston's probation officer on October 5, 2020.  See April 20 Tr. at 35:3-7 (Armijo, Osborn).

10.     Teston's October 5, 2020, probation appointment took place in the parking lot of the probation office in Portales, New Mexico, because of the COVID-19 pandemic.  See April 20 Tr. at 35:8-36:3 (Armijo, Osborn).

11.     Teston arrived in a white Chevrolet Silverado truck.  See April 20 Tr. at 36:2 (Osborn).

12.     With Teston in the driver's seat of his truck, Osborn requested a saliva sample for purposes of a drug test.  See April 20 Tr. at 36:3 (Osborn).

13.     Teston attempted to provide a saliva sample, but, over the course of twenty minutes, was not able to produce enough saliva to effectuate the test.  See April 20 Tr. at 36:11-16 (Armijo, Osborn).

14.     Teston told Osborn he was experiencing dry mouth.  See April 20 Tr. at 36:12-13 (Osborn).

15.     In Osborn's experience, dry mouth and the inability to produce saliva are symptoms of marijuana and methamphetamine use.  See April 20 Tr. at 36:17-20 (Armijo, Osborn); id. at 45:24-46:7 (Osborn, Taylor).[3]

16.     Teston's inability to produce saliva prompted Osborn to ask him to provide a urine sample.  See April 20 Tr. at 36:21-25 (Armijo, Osborn); id. at 44:1-9 (Osborn, Taylor).

17.     As Teston exited his truck, Osborn saw a $CO_2$ canister in plain view on the floor of the driver's side of the truck.  See April 20 Tr. at 37:2-5 (Osborn); id. at 37:22-24 (Armijo, Osborn); id. at 38:3-4 (Osborn); id. at 47:1-6 (Osborn, Taylor).

18.     In Osborn's experience, $CO_2$ canisters are used as components of air rifles and air pistols.  See April 20 Tr. at 37:12-21 (Armijo, Osborn); id. at 47:20-48:1 (Osborn, Taylor); id. at 49:2-6 (Osborn, Taylor).

---

[3]Dry mouth is a symptom of methamphetamine use, see Meth Mouth, Wikipedia, https://en.wikipedia.org/wiki/Meth_mouth (last visited April 27, 2023), and marijuana use, see Effects of Cannabis, Wikipedia, https://en.wikipedia.org/wiki/Effects_of_cannabis (last visited April 27, 2023).

19.     $CO_2$ canisters have other innocent uses outside the air-rifle-and-pistol context.  See April 20 Tr. at 48:2-6 (Osborn, Taylor).

20.     Osborn did not see an air pistol or air rifle in Teston's truck when he saw the $CO_2$ canister.  See April 20 Tr. at 49:2-6 (Osborn, Taylor).

21.     Osborn had not entered Teston's truck by the time Teston exited it to provide a urine sample.  See April 20 Tr. at 37:25-38:4 (Armijo, Osborn).

22.     Teston entered the probation office and provided a urine sample for a drug test.  See April 20 Tr. at 38:5-7 (Armijo, Osborn).

23.     Teston's drug test produced a positive result for THC, which the Probation Office counted as negative, because Teston had a medical marijuana card.  See April 20 Tr. at 38:14-17 (Osborn).

24.     Because Teston had a medical marijuana card, his use of medical marijuana would not be a violation of his State Order of Probation, but it could be probative of another violation, such as breaking New Mexico State law by driving under the influence of marijuana.  See April 20 Tr. at 46:8-47:1 (Osborn, Taylor); id. at 59:13-20 (Armijo, Osborn).

25.     Teston's drug test produced a faint line for methamphetamine.  See April 20 Tr. at 38:9-12 (Osborn); id. at 44:10-15 (Osborn, Taylor).

26.     At the time Teston's drug test produced a faint line for methamphetamine, Osborn was aware that Teston previously had tested positive for methamphetamine in August, 2020, and considered this fact in evaluating Teston's drug test.  See April 20 Tr. at 57:5-23 (Court, Armijo, Osborn, Taylor); id. at 58:5-7 (Armijo, Osborn).

27.     If a drug test reveals a faint line for methamphetamine, it is the Probation Office's policy to consider the test negative and send it to a laboratory for additional testing to confirm the

result.  See April 20 Tr. at 38:11-14 (Osborn); id. at 38:21-39:1 (Armijo, Osborn); id. at 44:10-21 (Osborn, Taylor); id. at 45:18-23 (Osborn, Taylor).

28.     Even though the Probation Office considers a faint line on a drug test negative for purposes of making a conclusive determination that a probationer is in violation of his or her order of probation (without further confirmation from a laboratory), it can consider an inconclusive test in determining whether there is reasonable suspicion that the probationer is using drugs.  See April 22 Tr. at 57:24-58:4 (Armijo, Osborn).

29.     The Probation Office sent Teston's drug test to a laboratory for further testing.  See April 20 Tr. at 39:2-7 (Armijo, Osborn); id. at 44:16-21 (Osborn, Taylor).

30.     Osborn discussed with his supervisor his concerns regarding the $CO_2$ canister that he saw in Teston's truck, Teston's dry mouth and inability to produce a saliva sample, and the faint line for methamphetamine on Teston's drug test.  See April 20 Tr. at 39:25-40:6 (Armijo, Osborn); id. at 49:7-18 (Osborn, Taylor).

31.     Osborn's supervisor told him that she believed he had reasonable suspicion to search Teston's truck.  See April 22 Tr. at 49:18-22 (Osborn).

32.     After the discussion with his supervisor, Osborn told Teston that he was planning to search Teston's truck and requested Teston's keys.  See April 20 Tr. at 40:13-16 (Osborn).

33.     Osborn took Teston's keys in part as a matter of officer safety.  See April 20 Tr. at 50:5-14 (Osborn, Taylor).

34.     Teston was not free to leave once Osborn took his keys.  See April 20 Tr. at 50:15-19 (Osborn, Taylor).

35.     After Teston provided Osborn his keys, Osborn asked if there was anything in the truck of which he should be aware.  See April 20 Tr. at 40:19-21 (Osborn).

36.     Teston told Osborn there was a "machete or some sort of knife that he used for camping and hiking."  April 20 Tr. at 40:22-24 (Armijo, Osborn).  See April 20 Tr. at 50:20-23 (Osborn, Taylor); id. at 55:20-56:1 (Osborn, Taylor).

37.     The area surrounding Portales is flat and provides few opportunities for hiking.  See April 20 Tr. at 59:4-6 (Osborn).

38.     The Probation Office considers knives to be lethal weapons, so Osborn believed that Teston was in violation of his Order of Probation by having a knife in his truck.  See April 20 Tr. at 41:3-6 (Osborn).

39.     Probationers are permitted to use knives for particular purposes, including for work or in the kitchen, but the knives must remain in the appropriate location for their permissible use and not in vehicles, unless the probationer receives permission.  See April 20 Tr. at 50:24-51:15 (Osborn, Taylor); id. at 58:22-59:4 (Armijo, Osborn).

40.     Osborn made the final decision to search Teston's truck after asking for the keys and Teston's mentioning that there was a knife in the truck.  See April 20 Tr. at 50:5-14 (Osborn, Taylor); id. at 58:8-21 (Armijo, Osborn).

41.     At the time Osborn searched Teston's truck, he was concerned about Teston having used drugs or being in possession of weapons.  See April 20 Tr. at 45:3-17 (Osborn, Taylor); id. at 58:18-21 (Osborn).

**3.     Teston's Truck's Search.**

42.     After Teston told Osborn about the knife in his truck, Osborn began searching Teston's truck.  See April 20 Tr. at 41:9-13 (Armijo, Osborn).

43.     Osborn saw toolboxes inside Teston's truck.  See April 20 Tr. 47:17-19 (Osborn, Taylor); id. at 52:2-54:14 (Court, Osborn, Taylor).

44.     While searching Teston's truck, Osborn found metal rods, a pill, fireworks, knives, a machete, a $CO_2$ canister with wires and screws attached, pipes with residue on them, a hypodermic needle, marijuana, and a $CO_2$ canister with gun powder.  See April 20 Tr. at 39:12-22 (Armijo, Osborn); id. at 41:20-42:13 (Osborn); id. at 59:10-12 (Armijo, Osborn); id. at 59:21-22 (Armijo, Osborn); id. at 59:23-60:16 (Armijo, Osborn).

45.     Based on what he found while searching Teston's truck, Osborn determined that Teston violated his probation's conditions and notified law enforcement.  See April 20 Tr. at 42:14-20 (Armijo, Osborn).

46.     Osborn left the Probation Office around 5:00 PM, but law enforcement continued an investigation until 11:00 p.m. or midnight.  See 42:21-43:3 (Armijo, Osborn).

47.     After Osborn searched Teston's truck, the laboratory test results for Teston's urine test came back negative for methamphetamine.  See April 20 Tr. at 44:22-45:2 (Osborn, Taylor).

## PROCEDURAL BACKGROUND

The United States brought an Indictment, filed August 23, 2022 (Doc. 1), against Teston containing two counts: (i) Count 1, Felon in Possession of Explosives under 18 U.S.C. § 842(i); and (ii) Count 2, Possession of an Unregistered Firearm (Destructive Device) under 26 U.S.C. §§ 5841(a), 5845(a)(5), 5861(d), and 5871.  See Indictment at 1-2.  The Indictment alleges that Teston, a felon with prior convictions for aggravated assault with a deadly weapon and possession of controlled substances, "knowingly possessed explosives," and "knowingly possessed a firearm, that is, a destructive device, and said firearm was not registered to him in the National Firearms Registration and Transfer Record."  Indictment at 1.  An Arrest Warrant, filed August 23, 2022 (Doc. 3), was issued for Teston, and he was arrested on September 13, 2022, see September 13, 2022 Docket Entry (no document number)(text-only).  On September 16, 2022, the Honorable

Steven C. Yarbrough, United States Magistrate Judge for the United States District Court for the District of New Mexico, placed Teston on supervised release, see Order Setting Conditions of Release, filed September 16, 2022 (Doc. 16), the conditions for which Magistrate Judge Yarbrough subsequently modified, see Order Modifying Conditions of Release, filed November 23, 2022 (Doc. 20).

On March 15, 2023, the United States filed a Superseding Indictment, filed March 15, 2023 (Doc. 34).  In the Superseding Indictment, the Grand Jury charges Teston with three counts: (i) the original Count 1, Felon in Possession of Explosives under 18 U.S.C. § 842(i); (ii) an amended Count 2, Possession of a Firearm Not Registered with the National Firearms Registration and Transfer Record under 26 U.S.C. §§ 5841, 5861(d) and 5871; and (iii) a new Count 3, Making of an Unregistered Firearm under 26 U.S.C. §§ 5841, 5861(f), and 5871.  See Superseding Indictment at 1-2.  The allegations in the Superseding Indictment's Count 1 are unchanged from those in the Indictment.  Compare Indictment at 1, with Superseding Indictment at 1.  The amended Count 2 states that Teston "knowingly possessed a firearm, a destructive device, more fully described as a flattened ball morphology, double base smokeless powder, an expended Crosman 12 gram $CO_2$ cartridge, screws, flattened metal, wire and tape, that was not registered in the National Firearms Registration and Transfer Record."  Superseding Indictment at 1-2.  The new Count 3 states that Teston made the "firearm, specifically, a destructive device" that Count 2 describes, and that it is "a destructive device as defined pursuant to 26 U.S.C. §§ 5845(a)(8), (f)(1), and (f)(3), that was not registered in the National Firearms Registration and Transfer Record."  Superseding Indictment at 2.

Teston filed the Suppression Motion on March 24, 2023.  See Suppression Motion at 1-5. Teston moves the Court to suppress evidence the State Probation Office seized when Osborn

searched Teston's vehicle on October 5, 2020, on the basis that Osborn lacked the reasonable suspicion required to search a probationer's vehicle. See Suppression Motion at 1-2. Teston contends that the United States' sole justification for the search was Osborn's seeing $CO_2$ canisters in Teston's truck, although Teston notes -- in a footnote and without further elaboration -- that the "[t]he officer also purported to suspect violations for illegal substances, presumably based on the fact that Mr. Teston could not provide a saliva sample . . . . But Mr. Teston's urinalysis did not come back positive for substances, which should have allayed concerns based on his inability to provide a saliva sample." Suppression Motion at 3 & n.2. Teston maintains that $CO_2$ canisters are common household items used for a variety of legal purposes. See Suppression Motion at 3. Further, Teston contends that the "presence of something so commonplace and associated largely with non-criminal activity on its own, cannot arouse reasonable suspicion that criminal activity is afoot." Suppression Motion at 4. Regarding Osborn's contention that $CO_2$ canisters are associated with air pistols, Teston states:

> Though courts must allow some deference to officers' expertise about seemingly harmless facts that may, in their experience, suggest criminal activity is afoot, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), such deference is not appropriate where there are "many wholly innocent explanations for the conduct, particularly where, as here, there is nothing else to support the officer's hunch. *United States v. Santos*, 403 F.3d 1120, 1133 (10th Cir. 2005). The presence of a single C02 cartridge is akin to evidence the Tenth Circuit has made clear does not arouse reasonable suspicion, including neatly packaged cardboard boxes and locked suitcases. *United States v. Karam*, 496 F.3d 1157, 1163 (10th Cir. 2007); *Santos*, 403 F.3d at 1133.

Suppression Motion at 4.

On April 14, 2023, the United States filed its Response to Defendant's Motion to Suppress Evidence, filed April 14, 2023 (Doc. 49)("Response"). In the Response, the United States emphasizes that Osborn's reasonable suspicion for purposes of Teston's vehicle's search came not

only from Osborn's having seen $CO_2$ canisters in the truck, but also: (i) Teston's inability to produce a saliva sample over the course of twenty minutes of attempts; (ii) Teston's previously having tested positive for methamphetamine; (iii) Teston's urine sample providing an inconclusive result regarding potential methamphetamine use; and (iv) Teston's telling Osborn that he had a knife in his truck.  See Response at 7.  The United States contends that the presence of the $CO_2$ canisters in Teston's truck "carries weight in the totality of the circumstances," and that, in any event, "the one [sic] found in Defendant's truck are generally used in bb guns and airsoft guns," which "can bear a striking similarity to real firearms."  Response at 7-8.  Citing United States v. McHugh, 639 F.3d 1250, 1256 (10th Cir. 2011), the United States asserts that "the Court need not rule out the possibility of innocent conduct when determining whether reasonable suspicion exists" and that "[j]ust because a CO2 cartridge may be utilized for innocent conduct does not invalidate the probation officer's concerns about the Defendant's possession of one."  Response at 8.

The Court held an evidentiary hearing on the Suppression Motion, as well as on other motions, on April 20, 2023.  See April 20 Clerk's Minutes at 1.  The United States conducted Osborn's direct examination.  See April 20 Tr. at 30:25-43:11 (Court, Armijo, Osborn, Taylor).  Next, Teston cross-examined Osborn.  See April 20 Tr. at 43:12-57:1 (Court, Armijo, Osborn, Taylor).  The United States' redirect examination followed.  See April 20 Tr. at 57:2-61:6 (Court, Armijo, Osborn, Taylor).

After dismissing Osborn as a witness, the Court accepted arguments from Teston.  See April 20 Tr. at 61:25-64:23 (Court, Taylor).  Teston reiterated his arguments that Osborn lacked reasonable suspicion to search the truck, emphasizing: (i) that Osborn learned there was a knife in the truck only after Teston gave him permission to conduct the search, handed him the keys, and was not free to leave; (ii) that the items in the truck, including the $CO_2$ canisters, could serve a

lawful purpose as tools; and (iii) that an inconclusive urine test is deemed negative pursuant to the Probation Office's policies, and that a laboratory later confirmed it to be negative. See April 20 Tr. at 62:9-64:25 (Taylor). The Court then heard the United States' arguments. See April 20 Tr. at 64:21-68:7 (Court, Armijo). The United States emphasized that Teston tested positive for methamphetamine on August 28, 2022, a few weeks before the October 5, 2022, probation appointment and the search of Teston's truck, and that this fact, paired with Teston's dry mouth and inability to produce a saliva sample, contributed to Osborn's reasonable suspicion. See April 20 Tr. at 65:7-25 (Armijo). The United States also emphasized that Teston told Osborn about the knife in his truck before Osborn began the search, but after Teston handed Osborn the truck's keys. See April 20 Tr. at 65:25-66:9 (Armijo). Further, the United States casts doubt on Teston's purported use of the knife for camping purposes, given that Teston had not submitted a travel request, and that there are few hiking and camping opportunities around Portales, and indicated that this incongruity contributed to Osborn's reasonable suspicion. See April 20 Tr. at 66:9-17 (Armijo). The United States disputed Teston's characterization of his truck as a "work truck," noting that it also contained weapons and illegal drugs. April 20 Tr. at 66:17-24 (Armijo). On questioning from the Court, the United States stated that serving as Teston's probation officer permitted Osborn to search the truck without a warrant. See April 20 Tr. at 67:4-14 (Court, Armijo). Teston later agreed that, if there were reasonable suspicion that Teston was using illegal drugs, then Osborn would be permitted to search Teston's truck under the probation agreement, but emphasized that reasonable suspicion did not exist. See April 20 Tr. at 68:8-69:9 (Court, Taylor). Teston further contended the laboratory confirmation that his urine test for methamphetamine was negative neutralized the issue of his dry mouth and inability to produce a

saliva sample, and that Osborn proceeded on a hunch to search Teston's truck.  See April 20 Tr. at 69:25-70:13 (Court, Taylor).

After the hearing, Teston filed his Reply to Government's Response to Motion to Suppress, filed April 24, 2023 (Doc. 59)("Reply").  In the Reply, Teston reiterates that "the circumstances of this case simply cannot establish reasonable suspicion to search the car for a probation violation related to substance use, from any angle."  Reply at 1.  Teston emphasizes that the faint line on Teston's urine test for methamphetamine is a "negative result" under Probation Office policies and "completely annihilates any suspicion about methamphetamine use that may have been aroused due to Mr. Teston's dry mouth."  Reply at 2 (footnote omitted).  Teston contends that, "without any evidence that suggested drug use at the time" of Teston's probation appointment, Teston's having previously tested positive for methamphetamine "cannot arouse reasonable suspicion." Reply at 3.  In addition, Teston maintains that "[e]ven assuming, *arguendo*, that there was some basis for suspecting a probation violation based on drug use, it is not clear that a search of the car would have been the logical next step."  Reply at 3.  As to Teston telling Osborn about the knife in his truck after Osborn announced that he would search the truck, Teston emphasizes that "[w]hen Mr. Teston disclosed his possession of the knife, the decision to search the vehicle had already made [sic]; the knife did not play into the reasonable suspicion analysis."  Reply at 3. Teston concludes that, "[b]ecause the C02 cannister alone did not provide cause to search the vehicle, and there was no cause to suspect a drug-related violation, the search was unjustified and violated Mr. Teston's fourth amendment rights."  Reply at 4.

On April 19, 2023, the United States filed its Second Superseding Indictment (Doc. 55). In the Second Superseding Indictment, the Grand Jury charges Teston with four counts: (i) the original Count 1, Felon in Possession of Explosives under 18 U.S.C. § 842(i); (ii) an amended

Count 2, Possession of a Firearm Not Registered with the National Firearms Registration and Transfer Record under 26 U.S.C. §§ 5841, 5861(d) and 5871; (iii) an amended Count 3, Making of an Unregistered Firearm under 26 U.S.C. §§ 5841, 5861(f), and 5871; and (iv) a new Count 4, Felon in Possession of Ammunition under 18 U.S.C. §§ 922(g)(1) and 924.  <u>See</u> Second Superseding Indictment at 1-3.  The allegations in the Second Superseding Indictment's Count 1 are unchanged from those in the Indictment and Superseding Indictment:

> Teston, knowing that he had been convicted to at least one crime punishable by imprisonment for a term exceeding one year, specifically:
>
> > (1)    aggravated assault with a deadly weapon, and
> >
> > (2)    possession of a controlled substance,
>
> knowingly possessed explosives in and affecting commerce.
>
> In violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.

Second Superseding Indictment at 1.  The amended Count 2 adds to the Superseding Indictment's allegations references to 26 U.S.C. § 5845(a) and (f):

> Teston[] knowingly possessed a firearm as defined by 26 U.S.C. § 5845(a) and (f), that is, a destructive device, made from a flattened ball morphology, double base smokeless powder, an expended Crosman 12 gram $CO_2$ cartridge, screws, flattened metal, wire and tape, that was not registered in the National Firearms Registration and Transfer Record.
>
> In violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.

Second Superseding Indictment at 2.  The amended Count 3 eliminates specific reference to the 26 U.S.C. §§ 5845(f)(3), instead referencing only 26 U.S.C. §§ 5845(a)(8) and (f)(1):

> Teston[] knowingly made a firearm as defined by 26 U.S.C. § 5845(a) and (f), that is a destructive device, made from a flattened ball morphology, double base smokeless powder, an expended Crosman 12 gram $CO_2$ cartridge, screws, flattened metal, wire and tape, which is a destructive device as defined pursuant to 26 U.S.C. §§ 5845(a)(8) and (f)(1), that was not registered in the National Firearms Registration and Transfer Record.

In violation of 26 U.S.C. §§ 5841, 5861(f) and 5871.

Second Superseding Indictment at 2.   The new Count 4 alleges that Teston was a felon in

possession of ammunition:

> Teston, knowing that he had been convicted to at least one crime punishable by imprisonment for a term exceeding one year, specifically:
>
> > (1)    aggravated assault with a deadly weapon, and
> >
> > (2)    possession of a controlled substance,
>
> knowingly possessed ammunition in and affecting commerce.
>
> In violation of 18 U.S.C. §§ 922(g)(1) and 924.

Second Superseding Indictment at 2.  The Second Superseding Indictment adds additionally three

Forfeiture Allegations.  See Second Superseding Indictment at 3.  The First Forfeiture Allegation

states:

> Upon conviction of any offense in violation of 18 U.S.C. § 842 (i), . . . Teston[] shall forfeit to the United States, pursuant to 18 U.S.C. §§ 844(c)(1), 981(a)(1)(C), 982(a)(2)(B), and 28 U.S.C. § 2461(c), any explosive materials involved or used or intended to be used in the offense, and any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including, but not limited to:
>
> > a.    double base smokeless powder.

Second Superseding Indictment at 3.  The Second Forfeiture Allegation states:

> Upon conviction of any offense in violation of 26 U.S.C. § 5861, . . . Teston[] shall forfeit to the United States, pursuant to[]26 U.S.C. § 5872 and 28 U.S.C. § 2461(c), any firearms involved in the commission of the offense(s), including, but not limited to:
>
> > a.    double base smokeless powder.

Second Superseding Indictment at 3.  The Third Forfeiture Allegation states:

Upon conviction of any offense in violation of 18 U.S.C. § 922(g), . . . Teston[] shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), any firearms and ammunition involved in the commission of the offense(s), including, but not limited to:

     a.     double base smokeless powder.

Second Superseding Indictment at 3.

Teston's case proceeded to trial on May 8, 2023.  See Clerk's Minutes at 1-15, filed May 8, 2023 (Doc. 112).  On May 9, 2023, the jury returned its Verdict, filed May 9, 2023 (Doc. 111).  The jury found Teston guilty on all counts, specifically: (i) Count 1, Felon in Possession of Explosives under 18 U.S.C. § 842(i); (ii) Count 2, Possession of a Firearm Not Registered with the National Firearms Registration and Transfer Record under 26 U.S.C. §§ 5841, 5861(d) and 5871; (iii) Count 3, Making of an Unregistered Firearm under 26 U.S.C. §§ 5841, 5861(f), and 5871; and (iv) Count 4, Felon in Possession of Ammunition under 18 U.S.C. §§ 922(g)(1) and 924.  See Verdict at 1.

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment to the Constitution of the United States of America protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011) (Browning, J.).   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978).   "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. Of Educ. Of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. V. Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."   Katz v. United States, 389 U.S. at 357(footnotes omitted).

### 1.        Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.   The Supreme Court

has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

      "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53(quoting Skinner v. Ry. Lab. Execs.' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the

particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court of the United States of America, has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia School Dist. 47J v. Acton, the Honorable Antonin G. Scalia, Associate Justice of the Supreme Court of the United States of

America, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654.

## 2.    **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not violate the Fourth Amendment, even if the officers do not have a search warrant.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given, including:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;"

(iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997])(citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. February 19, 2010)(Browning, J)(first alteration in United States v. Sedillo, but not United States v. Ledesma; fourth alteration in United States v. Sedillo, but not United States v. Anderson). See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010). In addition, the Tenth Circuit states:

In determining whether a consent to a search is voluntary, a court should consider, inter alia, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.

United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v.

Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d 784, 789-90 (10th Cir. 2007).  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

For example, in United States v. Gordon, 173 F.3d 761 (10th Cir. 1999), the suspect moved to suppress all physical evidence that an officer had seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's train passenger ticket and identification, inquired

into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not

inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The

officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at

765.  The officer asked the suspect whether he had any contraband, informing him that contraband

was the subject of her search.  See 173 F.3d at 765.  When the officer encountered the suspect's

locked bag, she asked him if the suspect could open it.  See 173 F.3d at 765.  Although the suspect

did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173

F.3d at 766.  On review, the Tenth Circuit concludes that the suspect's "voluntary relinquishment

of the key evidenced his consent to search the locked duffle bag."  173 F.3d at 765.  The Tenth

Circuit describes how the search of the locked bag, which was inside the suspect's other luggage,

did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.

The ultimate issue in determining the scope of consent is what a reasonable person would

have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453,

1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the

boundaries of the consent given based on the totality of the circumstances.  See United States v.

Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his or

her search and the suspect consents to a search for that object within a certain area, the Tenth

Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any

area within the confines of the officer's request where the object may be found.  United States v.

Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he

consented to a search of any area in the motel room where one might hide drugs").  See United

States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope

of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they

found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if a suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States v. Gordon, the Tenth Circuit concludes it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasizes in United States v. Gordon: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." 173 F.3d at 766.

3.      **Probable Cause for Search Warrants**.

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. 213, 239 (1983)), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238). See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ." United States v. Reed, 195 F. App'x at 822. The Court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United States, 362 U.S. at 271). This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213. Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d 1201, 1253-54 (D.N.M. 2013) (Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the Court should not defer to a magistrate judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States

v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

    **4.**    **Probation Searches.**

Although law enforcement officers typically must obtain a search warrant supported by probable cause before conducting a search, there are exceptions to this requirement where "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  United States v. Carter, 511 F.3d 1264, 1267 (10th Cir. 2008)(quoting Griffin v. Wisconsin. 483 U.S. 868, 873 (1987)).  The Supreme Court concludes that, in the State probation context, special needs negate the requirement that an officer obtain a warrant supported by probable cause.  See United States v. Carter, 511 F.3d at 1268 (citing Griffin v. Wisconsin, 483 U.S. at 875).  See, e.g., United States v. Romo, No. CR 14-2352, 2015 WL 13651108, at *4 (D.N.M. December 2, 2015)(Armijo, J.)(unpublished)(stating that New Mexico's State probation system presents a "special need" under Griffin v. Wisconsin).  For a probation search to meet the Fourth Amendment's requirements, it must be "'carried . . . out pursuant to state law which itself satisfies the Fourth Amendment's reasonableness requirement.'"  United States v. Carter, 511 F.3d at 1268 (quoting United States v. Lewis, 71 F.3d 358, 361 (10th Cir. 1995)).

In United States v. Knights, 534 U.S. 112 (2001), the Supreme Court concludes that a probationer who signs a probation agreement that clearly and unambiguously expresses the conditions under which the probationer is to be searched has a "significantly diminished . . . reasonable expectation of privacy."  534 U.S. at 119-20.  See United States v. Blake, 284 F. App'x 530, 535-536 (10th Cir. 2008)("The Supreme Court has concluded that 'probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment.'" (citing United States v. Trujillo, 404 F.3d 128, 1241-42 (10th Cir. 2005)(discussing

Griffin v. Wisconsin, 483 U.S. 868 (1987), and United States v. Knights, 534 U.S. 112 (2001))). In so concluding, the Supreme Court states that, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." United States v. Knights, 534 U.S. at 119. The Tenth Circuit "has interpreted *Knights* to mean that 'a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search.'" United States v. Freeman, 479 F.3d 743, 747 (10th Cir. 2007)(quoting United States v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002)(alteration in United States v. Freeman, but not United States v. Tucker)).

Reasonable suspicion is "['']merely a particularized and objective basis for suspecting criminal activity.'" United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200). While reasonable suspicion requires ""'some minimal level of objective justification,"''" it requires less justification than is required to show probable cause. United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances." United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

In a number of instances and in a variety of contexts, the Tenth Circuit has upheld probation searches when the officer conducting the search had reasonable suspicion to conduct the search pursuant to a probation agreement's terms. In United States v. Blake, the Tenth Circuit refused to suppress evidence found during a search pursuant to the defendant's wife's probation agreement of a residence that the defendant shared with his wife. See 284 F. App'x at 535-37. In United

States v. Stewart, 273 F. App'x 768 (10th Cir. 2008), the Tenth Circuit declined to suppress evidence found during the search of a defendant's residence, pursuant to the defendant's probation agreement, that police and probation agents conducted while attempting to execute an arrest warrant.  See 273 F. App'x at 769-71.  In United States v. Carter, the Tenth Circuit declined to suppress evidence found during the search of a defendant's residence on the basis of a tip which a social worker relayed to the defendant's probation officer that the defendant was in breach of his probation agreement, and also declined to suppress evidence found during a subsequent consensual search.  See 511 F.3d 1266-69.

## LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government generally will be prohibited from using that evidence in a criminal prosecution of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures . . . and confessions exacted in violation of the right against compelled self-incrimination or due process . . . .")(citing Mapp v. Ohio, 367 U.S. 643, 655-57 (1961); Dickerson v. United States, 530 U.S. 428, 435 (2000)); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if a defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once a defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-

Castro, 470 F.3d at 999.  The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d at 1255.

1.      **Attenuation Doctrine.**

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. 232, 238 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 579 U.S. at 238.  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to

admit the evidence in <u>Segura v. United States</u>, 468 U.S. 796 (1984), where it applied the independent source doctrine. <u>See</u> 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. <u>See</u> 468 U.S. at 799-800. They sought a warrant. <u>See</u> 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. <u>See</u> 468 U.S. at 800-01. The next evening, they obtained a search warrant. <u>See</u> 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" <u>Utah v. Strieff</u>, 679 U.S. at 240 (quoting <u>Segura v. United States</u>, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." <u>Brown v. Illinois</u>, 422 U.S. at 604. <u>See</u> <u>Utah v. Strieff</u>, 579 U.S. at 239 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. <u>See</u> <u>Davis v. United States</u>, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." <u>Utah v. Strieff</u>, 579 U.S. at 241. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." <u>Utah v. Strieff</u>, 579 U.S. at 241. <u>See</u> <u>United States v. Ramos</u>, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

2. **Good-Faith Exception**.

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that, in certain contexts, evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. at 238 (quoting United States v. Leon, 468 U.S. 908 n.6, and citing 468 U.S. 909, 919; Herring v. United States, 555 U.S. at 137).

### a. **Warrants Based on Illegally Obtained Information.**

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained

information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. [United States v.] Cusumano, 83 F.3d [1247,] 1250 [(10th Cir. 2005)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). See United States v. Cusumano, 83 F.3d at 1250 ("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

**b.      United States v. Leon.**

In United States v. Leon, the Supreme Court confronts the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court notes that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer at issue had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explains that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes

to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant. See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."   United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010) (Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d at 1007)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [*United States v. Leon*, 468 U.S.] at 918 . . . .  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [*United States v. Leon*, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  *Id.*  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id.* (quotation omitted).  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.  *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

### c.    Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in

the Dale County, Alabama, warrant database.  See 555 U.S. at 137.  In the search incident to that

arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then

indicted on federal gun- and drug-possession charges.  See 555 U.S. at 138.  It turned out, however,

that the warrant under which the officers arrested Herring had been recalled, but the database the

arresting officers had relied on had not been updated to reflect that recall.  See 555 U.S. at 138.

Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought

to suppress it.  See 555 U.S. at 138.  The district court denied Herring's motion to suppress, and

the United States Court of Appeals for the Eleventh circuit affirmed.  See 555 U.S. at 138.

The Supreme Court affirms the Eleventh Circuit, a decision based primarily on the good-

faith exception to the exclusionary rule.  See 555 U.S. at 140-46.  The Supreme Court agrees with

the Eleventh Circuit that, although the police's failure to update the warrant database to reflect that

Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.  See 555 U.S. at

140.  The Supreme Court reiterates its holding in United States v. Leon: "When police act under a

warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police

acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Herring

v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922).  After tracing

the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distills a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. at 144. The Supreme Court further explains that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

### d.     Davis v. United States.

In Davis v. United States, the Supreme Court confronts the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).

Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

On review, the Supreme Court determines that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explains that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court states: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concludes that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

### 3.   Inevitable-Discovery Exception.

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. 431, 444 (1984)).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply,

there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court states in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explains:

> In Cunningham and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."  Cunningham, 413 F.3d at 1204 n.1.  In Cunningham, police searched the defendant's home after getting his consent.  Id. at 1202.  The defendant later contested the search, claiming his consent was coerced.  Id.  We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.  Id. at 1205.  In Souza, police illegally opened a UPS package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred.  Id. at 1206.  Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] Larsen, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set[s] forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit states that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopts four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).  Applying the first factor, the Tenth Circuit states:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case.  Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office.  Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit states:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong.  The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

- 40 -

United States v. Souza, 223 F.3d at 1205-06.  The Tenth Circuit notes that a sergeant eventually obtained a search warrant.  See United States v. Souza, 223 F.3d at 1206.  Regarding the third factor, the Tenth Circuit asserts that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit does not reach the fourth factor, but concludes that, although it is

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convinces [it] that [the case before it is] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasizes the "['] danger of admitting unlawfully obtained evidence "on the strength of some judge's speculation that it would have been discovered legally anyway"[']"  782 F.2d at 152-53 (quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)(quoting United States v. Castellana, 488 F.2d 65, 68 (5th Cir. 1974))).  The Tenth Circuit considers whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53.  Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concludes:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a

significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ies] the inevitable discovery doctrine . . . because [it is] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered."  413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- states:

Here, the officers took substantial steps to obtain a warrant before the contested search occurred.  The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes.  As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately.  The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit explains:

The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway.  The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace.  The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit reasons: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home."  413 F.3d at 1205.  Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit states:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue.  [*United States v. Souza*, 223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search.  As a result, we are satisfied the government has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found.  *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205.  The Tenth Circuit, therefore, applies the inevitable-discovery doctrine.  See 413 F.3d at 1205.

Similarly, in United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied.  See 810 F. Supp. 2d at 1275-79.  Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court states: "The deputies did not take any steps to obtain a warrant before entering Christy's residence.  The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence . . . .  This factor thus weighs against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275.  As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court determines:

> The Court finds that Carvo had strong probable cause that Christy committed crimes.  At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.

> . . . .

> Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable."  These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.

> Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

> . . . .

- 44 -

Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and footnote omitted).  Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Court reasons:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI . . . .  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature." . . . If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant . . . .  Carvo is cross designated to acquire both state and federal search warrants . . . .  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1278-79 (second and third alterations in original).  As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determines:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applies the inevitable-discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirms the Court's decision.  See 739 F.3d at 539-44. Addressing the United States v. Souza factors, the Tenth Circuit notes that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit states:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y.  Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy.  Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable.  Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines

to engage in criminal sexual activity in violation of federal law.  *See Maryland v. Pringle*, 540 U.S. 336, 371 (2003).  The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542.  Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explains:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause.  Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason.  [*United States v.*] *Christy*, 810 F. Supp. 2d at 1279.  Instead, the deputies forced entry because they believed K.Y. was in danger.  Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not.  But that is beside the point.  The record fully supports the reasonableness of the deputies' assessment of danger.  The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543.  The Tenth Circuit concludes, therefore, that the Court properly applied the United States v. Souza factors.  See United States v. Christy, 739 F.3d at 542.

## **ANALYSIS**

The Court concludes that Osborn had reasonable suspicion to search Teston's truck under Teston's Order of Probation, and, accordingly, denies the Suppress Motion.  The Court proceeds through its reasonable suspicion analysis by examining the circumstances surrounding Teston's October 5, 2020, probation appointment, during which Osborn conducted a probation search of Teston's truck that yielded evidence that led to Teston's prosecution and conviction on four counts related to his being a felon in possession of explosives.  First, the Court examines Teston's Order of Probation's terms.  Second, the Court examines the facts that led to Osborn's search of Teston's truck and concludes that Osborn had reasonable suspicion to conduct the probation search.  Because Osborn had reasonable suspicion to conduct a probation search of Teston's truck, the Court denies the Suppression Motion.

As the first step in its Fourth Amendment analysis, the Court examines Teston's Order of Probation.   On February 3, 2020, Teston received a suspended sentence for possession of a controlled substance.   See Findings of Fact, supra ¶ 3, at 3 (citing April 20 Tr. at 32:24-33:4 (Armijo, Osborn); Amended Judgment at 1).   In connection with his suspended sentence, Teston received an Order of Probation, which Teston signed on February 7, 2020.   See Findings of Fact, supra ¶ 4, at 4 (citing April 20 Tr. at 33:5-19 (Armijo, Osborn); Order of Probation at 1-3).   The Order of Probation imposed a series of conditions on Teston, including that he not violate the laws of the State of New Mexico or any other jurisdiction, see Findings of Fact, supra ¶ 5, at 4 (citing Order of Probation ¶ 1, at 1; April 20 Tr. at 33:20-25 (Armijo, Osborn)), that he not "buy, sell, own or have in [his] possession at any time, firearms, ammunition, or other deadly weapons," Findings of Fact, supra ¶ 6, at 4 (quoting Order of Probation ¶ 8, at 2, and citing April 20 Tr. at 34:1-13 (Armijo, Osborn); id. at 48:11-15 (Osborn, Taylor)), and that Osborn be permitted to search Teston's "person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of [Teston's] conditions of probation," Findings of Fact, supra ¶ 7, at 4 (quoting Order of Probation ¶ 6, at 1, and citing April 20 Tr. at 34:14-25 (Armijo, Osborn)).   The Order of Probation "clearly and unambiguously expresses the conditions under which the probationer is to be searched," and, accordingly, Teston has a "significantly diminished . . . reasonable expectation of privacy" during his probation. United States v. Knights, 534 U.S. at 119-20.   Teston does not contest his Order of Probation's constitutionality, or, for that matter, that of the underlying regulations that govern the Order of Probation.   Even if he had made these arguments, New Mexico State probation searches are a permissible exception to the warrant requirement under the Supreme Court's Fourth Amendment jurisprudence, see United States v. Romo, 2015 WL 13651108, at *4 ("New Mexico's probation

system presents a 'special need' under *Griffin*.").   Accordingly, the Court turns its analysis to whether Osborn had reasonable suspicion to conduct a warrantless probation search of Teston's truck.

Examining the totality of the circumstances that led to Osborn's warrantless search of Teston's truck, the Court concludes that Osborn had reasonable suspicion to conduct the search. The Tenth Circuit's interpretation of the Supreme Court's holding in United States v. Knights is that "'a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search.'"   United States v. Freeman, 479 F.3d at 747 (quoting United States v. Tucker, 305 F.3d at 1200 (alteration in United States v. Freeman, but not United States v. Tucker)).   Reasonable suspicion is "merely a particularized and objective basis for suspecting criminal activity."   United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200).   While reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause.   United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. at 217, and citing United States v. Sokolow, 490 U.S. at 7).   In assessing whether reasonable suspicion exists for a search, courts "consider the quantity and reliability of the information possessed by law enforcement and consider this information in light of the totality of the circumstances."   United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

The first factor weighing in favor of reasonable suspicion emerges from Osborn's request for a saliva sample from Teston during his October 5, 2020, probation appointment, which took place in the parking lot of the probation office in Portales, New Mexico, due to the COVID-19 pandemic.   See Findings of Fact, supra ¶ 10, at 4 (citing April 20 Tr. at 35:8-36:3 (Armijo, Osborn); id. ¶ 12, at 5 (citing April 20 Tr. at 36:3 (Osborn)).   Teston attempted to provide a saliva sample

but, over the course of twenty minutes, was not able to produce enough saliva to effectuate the test, see Findings of Fact, supra ¶ 13, at 5 (citing April 20 Tr. at 36:11-16 (Armijo, Osborn)), and told Osborn he was experiencing dry mouth, see Findings of Fact, supra ¶ 14, at 5 (citing April 20 Tr. at 36:12-13 (Osborn)). In Osborn's experience, dry mouth and the inability to produce saliva are symptoms of marijuana and methamphetamine use. See Findings of Fact, supra ¶ 15, at 5 (citing April 20 Tr. at 36:17-20 (Armijo, Osborn); id. at 45:24-46:7 (Osborn, Taylor)). Because Teston had a medical marijuana card, his use of medical marijuana would not be a violation of his State Order of Probation, but it could be probative of another violation, such as breaking New Mexico State law by driving under the influence of marijuana, see Findings of Fact, supra ¶ 23, at 6 (citing April 20 Tr. at 46:8-47:1 (Osborn, Taylor); id. at 59:13-20 (Armijo, Osborn)), particularly given that Teston drove to his probation appointment, see Findings of Fact, supra ¶ 11, at 5 (citing April 20 Tr. at 36:2 (Osborn)). In any event, Teston's dry mouth and inability to produce a saliva sample for twenty minutes, particularly in light of Osborn's awareness that Teston previously had tested positive for methamphetamine use in August, 2020, also raised the possibility of his using methamphetamine again, in violation of his Order of Probation. See Findings of Fact, supra ¶ 26, at 6 (citing April 20 Tr. at 57:5-23 (Court, Armijo, Osborn, Taylor); id. at 58:5-7 (Armijo, Osborn)). Twenty minutes is a significant amount of time to be unable to produce saliva; Teston had a severe case of dry mouth that could arouse suspicion in a reasonable probation officer, particularly in light of Teston's drug-use history. While there may be innocent reasons for a defendant to be unable to produce saliva for such a significant length of time, including medical conditions, the Court concludes that Teston's inability to complete Osborn's first requested drug test -- particularly in light of Teston's record of drug use -- contributes to "a particularized and objective basis for suspecting criminal activity." United States v. Freeman, 479 F.3d at 748.

Teston's inability to produce saliva, especially considered with other factors, is one factor in the totality of the circumstances analysis weighing in reasonable suspicion's favor.  See United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).

The second factor weighing in favor of reasonable suspicion is Osborn's seeing a $CO_2$ canister in plain view on the floor of the driver's side of the truck as Teston exited it to provide a urine sample.  See Findings of Fact, supra ¶ 16, at 5 (citing April 20 Tr. at 36:21-25 (Armijo, Osborn); id. at 44:1-9 (Osborn, Taylor); id. ¶ 17, at 5 (citing April 20 Tr. at 37:2-5 (Osborn); id. at 37:22-24 (Armijo, Osborn); id. at 38:3-4 (Osborn); id. at 47:1-6 (Osborn, Taylor)).  Osborn had not entered Teston's truck at the time he saw the $CO_2$ canister in plain view.  See Findings of Fact, supra ¶ 21, at 6 (April 20 Tr. at 37:25-38:4 (Armijo, Osborn)).  In Osborn's experience, $CO_2$ canisters are used as components of air rifles and air pistols.  See Findings of Fact, supra ¶ 18, at 5 (citing April 20 Tr. at 37:12-21 (Armijo, Osborn); id. at 47:20-48:1 (Osborn, Taylor); id. at 49:2-6 (Osborn, Taylor)).  Accordingly, their presence in Teston's truck could be probative of a different violation of the Order of Probation than Teston's dry mouth suggested, i.e., that Teston, a felon, might be in possession of a weapon.  See Findings of Fact, supra ¶ 6, at 4 (quoting Order of Probation ¶ 8, at 2, and citing April 20 Tr. at 34:1-13 (Armijo, Osborn); id. at 48:11-15 (Osborn, Taylor)).

As with Teston's inability to produce saliva, there are potential innocent explanations for his possessing a $CO_2$ canister, see Findings of Fact, supra ¶ 19, at 6 (citing April 20 Tr. at 48:2-6 (Osborn, Taylor)), particularly given that Osborn did not see an air pistol or air rifle in Teston's truck, see Findings of Fact, supra ¶ 20, at 6 (April 20 Tr. at 49:2-6 (Osborn, Taylor)).  The Court, however, "'need not rule out the possibility of innocent conduct,' . . . and reasonable suspicion may exist 'even if it is more likely than not that the individual is not involved in any illegality.'"

United States v. McHugh, 639 F.3d 1250, 1256 (10th Cir. 2011)(quoting United States v. Arvizu, 534 U.S. 266, 277 (2002); United States v. Albert, 579 F.3d 1188, 1197 (10th Cir. 2009)(quoting United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004))).  Indeed, a reasonable probation officer could find it suspicious to find an item associated with air rifles and air pistols in such an unusual place as the driver's seat footwell of a probationer's truck, particularly given that it was not in its packaging or stowed, which suggests Teston may have used it while out of the house and on the road.  See Findings of Fact, supra ¶ 17, at 5 (citing April 20 Tr. at 37:2-5 (Osborn); id. at 37:22-24 (Armijo, Osborn); id. at 38:3-4 (Osborn); id. at 47:1-6 (Osborn, Taylor); id. ¶ 18 (citing April 20 Tr. at 37:12-21 (Armijo, Osborn); id. at 47:20-48:1 (Osborn, Taylor); id. at 49:2-6 (Osborn, Taylor)).  The $CO_2$ canister was not in a place that would suggest one of the innocent uses for $CO_2$ canisters, for example, in proximity to a home soda maker or bicycle tire inflater, Teston's examples of product for which there is an innocent use of $CO_2$ canisters.  See Suppression Motion at 3-4.  While the $CO_2$ canister's discovery does not by itself create reasonable suspicion, it contributes to a "particularized and objective basis for suspecting criminal activity," United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200), and therefore to reasonable suspicion, particularly in light of Osborn having just witnessed Teston's inability to produce a saliva sample.

The third factor weighing in favor of reasonable suspicion arises from Teston's urine drug test results.  Teston's urine test produced a positive result for THC, which the Probation Office counts as negative, because Teston had a medical marijuana card.  See Findings of Fact, supra ¶ 23, at 6 (citing April 20 Tr. at 38:14-17 (Osborn)).  In addition, Teston's drug test produced a faint line for methamphetamine, see Findings of Fact, supra ¶ 26, at 6 (citing April 20 Tr. at 38:9-12 (Osborn); id. at 44:10-15 (Osborn, Taylor)), which led the Probation Office, according to its

policies, to consider the test negative and send it to a laboratory for additional testing to confirm the result, see Findings of Fact, supra ¶ 27, at 6-7 (citing April 20 Tr. at 38:11-14 (Osborn); id. at 38:21-39:1 (Armijo, Osborn); id. at 44:10-21 (Osborn, Taylor); id. at 45:18-23 (Osborn, Taylor)). Even though Teston was permitted to use medical marijuana, a test that revealed THC's presence in Teston's system -- even if reported negative under Probation Office policies, because of Teston's medical marijuana card -- could indicate other violations of the Order of Probation, including driving under the influence of marijuana.  See Factual Background, supra ¶ 24, at 6 (April 20 Tr. at 46:8-47:1 (Osborn, Taylor); id. at 59:13-20 (Armijo, Osborn)).  Similarly, as to the methamphetamine result, even though the Probation Office considers a faint line on a drug test negative for purposes of making a conclusive determination that a probationer is in violation of his or her order of probation, without further confirmation from a laboratory, an inconclusive test can factor reasonably into determining whether there is reasonable suspicion that the probationer is using methamphetamine.  See Factual Background, supra ¶ 28, at 7 (citing April 22 Tr. at 57:24-58:4 (Armijo, Osborn)).  Under Probation Office policies, a faint line and inconclusive test cannot be treated as conclusive proof of drug use without confirmation from a laboratory after additional testing, see Finding of Fact, supra ¶ 27, at 6-7 (citing April 20 Tr. at 38:11-14 (Osborn); id. at 38:21-39:1 (Armijo, Osborn); id. at 44:10-21 (Osborn, Taylor); id. at 45:18-23 (Osborn, Taylor)), but reasonable suspicion requires "'some minimal level of objective justification'" from the totality of the circumstances, not conclusive proof, United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. at 217, and citing United States v. Sokolow, 490 U.S. at 7). Accordingly, for both the marijuana and methamphetamine results, whatever the Probation Office policies dictate regarding conclusive proof, Osborn was free to consider indications of potential drug use -- including from a faint line and inconclusive test -- in evaluating whether he had

reasonable suspicion to search Teston's truck.  That the laboratory results for Teston's urine test eventually came back negative for methamphetamine is not the key fact here; it is that, when the methamphetamine result came back inconclusive, with a faint line, Osborn had reason to believe that Teston might be using methamphetamine on the basis of that faint line.  At this stage in the probation appointment, a reasonable officer could have suspicion that Osborn had methamphetamine in his system, particularly given his previous inability to produce a saliva sample for twenty minutes, see Factual Background, supra ¶ 13, at 5 (citing April 20 Tr. at 36:11-16 (Armijo, Osborn)), and in light of Teston's having tested positive for methamphetamine roughly two months before his probation appointment, in August, 2020, see Factual Background, supra ¶ 8, at 4 (citing April 20 Tr. at 57:5-20 (Court, Armijo, Osborn, Taylor)).  Once Osborn was aware of all of this information, it was reasonable for him to tell Teston that he was planning to search his truck.  See Findings of Fact, supra ¶ 32, at 7 (citing April 20 Tr. at 40:13-16 (Osborn)).

The Court concludes that (i) Teston's inability to produce a saliva sample for twenty minutes, (ii) Osborn's plain-view discovery of a $CO_2$ canister in Teston's truck, and (iii) Teston's urine drug test results were sufficient to create reasonable suspicion before Osborn told Teston he was planning to search his truck, because, taken together, they form a "particularized and objective basis for suspecting criminal activity."  United States v. Freeman, 479 F.3d at 748 (quoting United States v. Tucker, 305 F.3d at 1200).[4]  Indeed, that Osborn felt compelled to discuss with his

---

[4]In addition, Osborn found additional grounds for reasonable suspicion after he told Teston he would search his truck when, once Teston provided Osborn his keys, Osborn asked if there was anything in the truck of which he should be aware, see Findings of Fact, supra ¶ 35, at 7 (citing April 20 Tr. at 40:19-21 (Osborn)), and Teston told Osborn there was "a machete or some sort of knife that he used for camping and hiking," Findings of Fact, supra ¶ 36, at 8 (quoting April 20 Tr. at 40:22-24 (Armijo, Osborn), and citing April 20 Tr. at 50:20-23 (Osborn, Taylor); id. at 55:20-56:1 (Osborn, Taylor)).  The Probation Office considers knives to be lethal weapons, so Osborn believed that Teston was in violation of his Order of Probation by having a knife in his truck.  See

supervisor his concerns regarding the $CO_2$ canister, Teston's dry mouth and inability to produce a saliva sample, and the faint line for methamphetamine on Teston's drug test indicates the cumulative effect that these three discoveries had on his level of suspicion toward Teston.  See Factual Background, supra ¶ 30, at 7 (citing April 20 Tr. at 39:25-40:6 (Armijo, Osborn); id. at 49:7-18 (Osborn, Taylor)).  Osborn's supervisor told Osborn that she believed there was reasonable suspicion to search Teston's truck.  See Factual Background, supra ¶ 31, at 7 (citing April 22 Tr. at 49:18-22 (Osborn)).  The Court agrees with Osborn's supervisor that, by the time Teston's urine tests came back, enough indications of Teston's suspicious activity had accumulated to constitute reasonable suspicion.  See Factual Background, supra ¶ 31, at 7 (citing April 22 Tr. at 49:18-22 (Osborn)).

The Tenth Circuit directs the Court to "consider the quantity and reliability of the information possessed by law enforcement," and to "consider this information in light of the totality of the circumstances."  United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).  That Osborn saw firsthand Teston's inability to produce saliva for twenty

---

Findings of Fact, supra ¶ 38, at 8 (citing April 20 Tr. at 41:3-6 (Osborn)).  Probationers are permitted to use knives for particular purposes, including for work or in the kitchen, but the knives must remain in the appropriate location for their permissible use and not in vehicles, unless the probationer receives permission.  See Findings of Fact, supra ¶ 39, at 8 (citing April 20 Tr. at 50:24-51:15 (Osborn, Taylor); id. at 58:22-59:4 (Armijo, Osborn)).  While Osborn testifies that he made the final decision to search Teston's truck after Teston mentioned the knife, see Findings of Fact, supra ¶ 40, at 8 (citing April 20 Tr. at 50:5-14 (Osborn, Taylor); id. at 58:8-21 (Armijo, Osborn)), the Court considers the key information to consider in its reasonable suspicion analysis to be the information which Osborn had before he informed Teston that he would search his truck and asked for his keys, see Findings of Fact, supra ¶ 32, at 7 (citing April 20 Tr. at 40:13-16 (Osborn)).  Teston alerting Osborn to the knife in his truck, however, provides additional confirmation of Osborn's reasonable suspicion.

minutes, his $CO_2$ canister in his car, and the results of his urine test -- even if inconclusive -- contributes to their reliability.  See United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).   That these are three separate occurrences indicates a "quantity . . . of . . . information" that could give a reasonable probation officer an indication that Teston was violating the Order of Probation, particularly in light of his having tested positive for methamphetamine just two months beforehand.  United States v. Freeman, 479 F.3d at 749 (citing United States v. Sokolow, 490 U.S. at 8).  Noting that, although reasonable suspicion requires "'some minimal level of objective justification,'" it requires less justification than is required to show probable cause, the Court concludes that, by the time Teston's urine test results arrived, Osborn had reasonable suspicion to search Teston's truck.  United States v. Freeman, 479 F.3d at 749-50 (quoting INS v. Delgado, 466 U.S. 210, 217 (1984), and citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

Having concluded that Osborn had reasonable suspicion, the Court considers specifically Teston's contention that, "[e]ven assuming, *arguendo*, that there was some basis for suspecting a probation violation based on drug use, it is not clear that a search of the car would have been the logical next step" and concludes that this defense is unpersuasive.  See Reply at 1.  First, the Court notes that, from (i) Teston's inability to produce saliva, (ii) possession of a $CO_2$ canister, and (iii) urine test results, Osborn had suspicion about two Order of Probation violations -- possession of firearms as well as drugs -- and not just "a probation violation related to substance use," Reply at 1, as Teston states.  Indeed, Osborn testifies that, at the time Osborn searched Teston's truck, he was concerned about Teston having used drugs or being in possession of weapons.  See Findings of Fact, supra ¶ 41, at 8 (citing April 20 Tr. at 45:3-17 (Osborn, Taylor); id. at 58:18-21 (Osborn)).  The $CO_2$ canister was probative of a firearms violation, and the inability to produce saliva and

urine test results were probative of a drug violation.  As to the logicality of the vehicle search, it should first be noted that the Order of Probation provides specific authorization for Osborn to search Teston's vehicle.  See Findings of Fact, supra ¶ 7, at 4 (quoting Order of Probation ¶ 6, at 1, and citing April 20 Tr. at 34:14-25 (Armijo, Osborn)).  The $CO_2$ canister's presence in the vehicle could lead a reasonable offer to suspect that a firearm with which the canister is associated could also be inside the vehicle.  A vehicle search could uncover firearms or drugs.  As to the drug concerns, Teston's inability to produce saliva and inconclusive urine test results are probative of recent drug use, possibly while in transit to the probation office, which provides particular justification for a vehicle search.  Even if it is true, as Teston suggests, that "searching a car is not the typical course of action in response to a suspected DWI," that is beside the point.  See Reply at 2 n.2.  If a probation officer has reasonable suspicion that a probationer is violating his probation order by driving under the influence of drugs and the probation order permits a vehicle search, that officer is permitted to search the vehicle, given the probationer's "significantly diminished . . . reasonable expectation of privacy."  United States v. Knights, 534 U.S. at 119-20.  The Court concludes that it was a reasonable exercise of Osborn's authority under the Order of Probation to search Teston's truck, given Osborn's reasonable suspicion that the vehicle contained drugs or firearms.  Accordingly, the Court declines to suppress the evidence resulting from Osborn's search of Teston's truck.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence, filed March 24, 2023 (Doc. 39), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Maria Ysabel Armijo
Christopher McNair
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Stephen A. Taylor
Martin Juarez
Office of the Federal Public Defender
Albuquerque, New Mexico

      *Attorneys for the Defendant*