**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                 No. CR 22-1400 JB

TROY DON TESTON,

     Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Dismiss the Indictment, filed March 13, 2023 (Doc. 30)("MTD"); (ii) the Defendant's Motion to Dismiss the Superseding Indictment, filed March 17, 2023 (Doc. 36)("Second MTD"); and (iii) the Defendant's Motion to Dismiss With Prejudice for Prosecutorial Misconduct, filed May 5, 2023 (Doc. 98)("MTD for Prosecutorial Misconduct"). The Court held a hearing on the MTD and the Second MTD on April 20, 2023, <u>see</u> Clerk's Minutes (dated April 20, 2023), filed April 20, 2023 (Doc. 71), and held a hearing on the MTD for Prosecutorial Misconduct on May 5, 2023, <u>see</u> Clerk's Minutes (dated May 5, 2023), filed May 5, 2023 (Doc. 114). The primary issues are: (i) whether, following the Supreme Court of the United States' opinion in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1 (2022)("<u>Bruen</u>"), 18 U.S.C. § 842(i) is unconstitutional as applied to Defendant Troy Don Teston, because his destructive device is entitled to Constitutional protection under the Second Amendment to the Constitution of the United States pursuant to <u>Bruen</u>'s two-part test; (ii) whether a conviction under 26 U.S.C. § 5841(a) requires the United States to prove Teston's intent to use his destructive device as a weapon; and (iii) whether the Court should dismiss the matter with prejudice, because of the United States' alleged misconduct related to a defense witness, when a United States Attorney sent an email to a

supervisor of one of the United States' witnesses expressing dissatisfaction regarding the witness' noncompliance with pretrial interviews.  The Court concludes: (i) Teston's charge under 18 U.S.C. § 842(i) does not violate the Second Amendment, because the Second Amendment's plain text does not cover Teston's conduct, and, moreover, case law from the United States Court of Appeals for the Tenth Circuit affirms the constitutionality of felon-in-possession restrictions; (ii) Teston's argument regarding the subjective intent related to his destructive device is not persuasive, because the United States is no longer proceeding on its 26 U.S.C. § 5845(f)(3) theory, and the Court holds that 26 U.S.C. § 5845(f)(1) requires no proof of subjective intent; and (iii) the conduct alleged to be prosecutorial misconduct does not rise to the Constitutionally required level of threatening or intimidating potential witnesses, because the United States Attorney's remarks did not intimidate or threaten the witness, and there is no indication that the witness' potential testimony would be favorable to Teston.  The Court therefore denies the MTD, the Second MTD, and the MTD for Prosecutorial Misconduct.

## **FACTUAL BACKGROUND**

The Court provides this Factual Background solely for the purpose of this Memorandum Opinion and Order.  The Court takes these facts from the Second Superseding Indictment, filed April 19, 2023 (Doc. 55)("Second Superseding Indictment"), the Second MTD, the United States' Response to Defendant's Motion to Dismiss, filed April 7, 2023 (Doc. 46)("MTD Response"),[1] the MTD for Prosecutorial Misconduct, the United States' Response to Defendants' Motion to

---

[1]The MTD Response serves as a response to both the MTD and the Second MTD.  See MTD Response at 1.  As the United States notes in the MTD Response, the "Defendant initially filed a motion to dismiss the original indictment.  ECF No. 30.  Both motions raise the same issues and arguments, the difference being that Defendant included Count 3 (added in the superseding indictment) to his argument that the Government failed to state an offense."  MTD at 1 n.1.

Dismiss with Prejudice for Prosecutorial Misconduct, filed May 7, 2023 (Doc. 101)("MTD for Prosecutorial Misconduct Response"), and the Court's Memorandum Opinion and Order, filed August 28, 2023 (Doc. 126)("Suppression MOO").  The Court separates this factual background into two sections, the first of which concerns the issues in the MTD and the Second MTD, and the second which concerns the facts pertinent to the MTD for Prosecutorial Misconduct.

1.  __Facts for the MTD and the Second MTD.__

On October 5, 2020, Teston arrived at a probation office in Portales, New Mexico, for a scheduled probation appointment.  See Suppression MOO at 4.  At the appointment, pursuant to a reasonable suspicion of criminal wrongdoing, see Suppression MOO at 47-57, law enforcement conducted a search of Teston's truck, see Second MTD at 1; MTD Response at 2.  In the truck, Teston's probation officer found metal rods, a pill, fireworks, knives, a machete, a $CO_2$ canister with wires and screws attached, pipes with residue on them, a hypodermic needle, marijuana, and a $CO_2$ canister with gun powder.  See Suppression MOO at 9.  Bomb squad technicians arrived at the scene and examined the materials:

> Upon examining the CO2 cartridge . . . the technicians could see that multiple screws were embedded in the device and that metal wire had been wrapped around the screws.  A metal tab or screw had also been secured into the neck of the cartridge and piece of tape was affixed to the bottom covering a small hole.  It was also clear from an x-ray examination that the device contained powder.  The bomb technicians then used a robot to separate the powder from the CO2 cartridge.  Upon testing the powder removed from the cartridge with an open flame, it was determined to be "energetic," meaning it burned.

MTD Response at 3.  After conducting this search, law enforcement obtained a search warrant to conduct a search of Teston's home, wherein officers obtained other materials, including further $CO_2$ canisters and wire consistent with the materials in Teston's truck.  See Second MTD at 1, MTD Response at 3.  After all these materials were sent to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, an Explosives Enforcement Officer concluded that the modified $CO_2$

cartridge was "consistent with one improvised explosive weapon," and it was his opinion that the device "was designed as a weapon and would be properly identified as an improvised explosive bomb."  MTD Response at 3.

> Mr. Teston was initially charged with violating 18 U.S.C. § 842(i) for being a felon in possession of explosives (Count One) and 26 U.S.C. §§ 5841(a), 5845(a)(8), 5861(d) and 5871 for possession of an unregistered firearm (destructive device) (Count Two)(Indictment)(Doc. 2). In a superseding indictment filed on March 15, 2023, he was also charged for having made a firearm (destructive device) in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871.

Second MTD at 2.

### 2.        Facts for the MTD For Prosecutorial Misconduct.

Portales Police Department Detective Nick Sanchez is on both the United States' and Teston's pre-trial witness lists.  See United States' Witness List at 1, filed May 1, 2023 (Doc. 74); Defendant's Witness List at 1, filed May 1, 2023 (Doc. 77).  Before trial, Assistant United States Attorney Maria Armijo attempted, unsuccessfully, to meet with Sanchez to review transcripts of conversations between Sanchez and Teston, and to "to refresh his memory of the events and verify the accuracy of the transcripts prepared by the United States."  MTD for Prosecutorial Misconduct Response at 2.  In the midst of this apparent inability to meet with Sanchez, Ms. Armijo sent an email to two agents -- Marcus Robinson and Russell Davis -- from the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  See Email from Maria Armijo to Marcus Robinson and Russell Davis (dated May 4, 2023), filed May 5, 2023 (Doc. 98-1)("Armijo Email").  The Armijo Email -- on which Teston's counsel was cc'd[2] -- states:

**Subject**: PPD - Nick Sanchez

---

[2]The United States represents that Teston's counsel was "inadvertently cc'd" on this email. MTD for Prosecutorial Misconduct at 2.

> Just FYI -- he is being uncooperative with us about meeting with him in person to pretrial. I just had a very direct call with Capt. Lujan about him -- and told him we may not be taking any cases Federally from PPD unless their officers want to work with us. I gave Sanchez the choice to me [sic] with us in person Sunday in Roswell (he said busy with family), Monday after court (he said he wouldn't stay bc he had to go back to work on other cases) -- so I told the Capt. He could travel down to LC tomorrow to meet with me in person at 1:00 pm.
>
> Marcus -- I want you present when we meet with this guy! Will keep you updated.
>
> Russ -- don't know if you know these guys -- but I am very disappointed in their lack of enthusiasm.

Armijo Email at 1.  Following the Court's Memorandum Opinion and Order, filed May 5, 2023 (Doc. 99)("Subjective Intent MOO"), in which the Court concludes that Teston's intent regarding the possession of the explosive materials is not relevant to the charges in the operative indictment, see Subjective Intent MOO at 15-31, the United States asserts that Sanchez is no longer relevant in this case: "Because the only relevant purpose of Officer Sanchez' testimony in this case would be to talk about Teston's post-*Miranda* statements, that bear on his intent, he is no longer a relevant witness in this case.  Indeed, the United States does not intend to call Detective Sanchez during its case-in-chief," MTD for Prosecutorial Misconduct Response at 3.

## PROCEDURAL BACKGROUND

Like the factual background section, the Court offers here a bifurcated procedural background section.  First, the Court provides the procedural background as it pertains to the MTD and the Second MTD.  Second, the Court provides the procedural background related to the MTD for Prosecutorial Misconduct.

### 1.     The MTD and the Second MTD.

At the outset, the Court observes that the MTD and the Second MTD are -- almost verbatim -- identical.  The only substantive difference between the two motions concerns the fact that, between the MTD and the Second MTD, the United States filed the Second Superseding

Indictment, in which the United States added Count 3, which alleges that Teston violated 26 U.S.C.

§§ 5841, 5861(f), and 5871, Making of an Unregistered Firearm.  <u>See</u> Second Superseding

Indictment at 1.  The MTD, therefore, only addresses Counts 1 and 2, while the Second MTD adds

an argument that relates to Count 3.  The arguments related to Counts 1 and 2, however, are

identical in both the MTD and the Second MTD, and the Second MTD essentially restates the

MTD's Count 2 arguments and applies those same contentions to Count 3.  <u>Compare</u> MTD 7-12,

<u>with</u> Second MTD at 7-13.  For this reason, the Court focuses its discussion on the Second MTD,

which fully subsumes all arguments made in the MTD.

The Second MTD begins with Teston's arguments based on the Second Amendment.  <u>See</u>

Second MTD at 2-7.  Teston's Second Amendment contentions are based on the Supreme Court's

opinion in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1 (2022)("<u>Bruen</u>"), which

he quotes for the proposition that, "when the government regulates the possession of arms, it 'must

justify its regulation by demonstration that it is consistent with the Nation's historical tradition' of

regulation."  Second MTD at 2 (quoting <u>Bruen</u>, 597 U.S. at 24).[3]  To undertake this analysis,

Teston contends that the proper analysis is conducted as follows:

> In determining whether a regulation is constitutional, courts must "assess whether
> modern firearms regulations are consistent with the Second Amendment's text and
> historical understanding" by using analogical reasoning, which "requires [] that the
> government identify a well-established and representative historical analogue[.']"
> [<u>Bruen</u>, 142 S.Ct.] at 2131. "Only then may a court conclude that the individual's
> conduct falls outside the Second Amendment's unqualified command." <u>Id.</u> at 2130
> (quoting <u>Koningsberg v. State Bar of Cal.</u>, 366 U.S. 36, 50 n. 110 (1961)).

---

[3]Teston's quoting of <u>Bruen</u> contains a few minor, non-substantive, inaccuracies.  The
phrase in the opinion reads: ". . . must then justify its regulation by demonstrating that it is
consistent with the Nation's historical tradition . . . ."  <u>Bruen</u>, 597 U.S. at 24.

Second MTD at 2 (first and second brackets in Second MTD).  Teston contends that, according to this test, 18 U.S.C. § 842(i) is unconstitutional as applied to his case's facts.  See Second MTD at 3-7.  Teston's argument proceeds in two steps.  First, he argues that the "history of regulating possession of firearms by dangerous persons does not include possession of the 'explosives' Mr. Teston had."  Second MTD at 3.  Second, he argues, apparently in the alternative, that any "prohibition on possession of firearms by dangerous persons cannot apply to non-violent felons like Mr. Teston."  Second MTD at 6.  The Court outlines each argument in turn.

On the former, Teston states that, in undertaking the historical analysis that Bruen requires, the historical record reflects that "[t]he 'longstanding prohibition' [against the possession of firearms by convicted felons] referred to by the Court appears to find its origin in founding era documents suggesting that those who pose 'a real danger of public injury' might not benefit from Second Amendment protections."  Second MTD at 3 (quoting Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 326 (2d ed. 1891); 2 Bernard Schwartz, The Bill of Rights: Documentary History 675, 681 (1971)).  Teston asserts that this "animating concern does not extend to the regulation of explosives, particularly the types of explosives found in Mr. Teston's possession."  Second MTD at 4.  Teston offers two main rationales for this proposition.  First, he states that, although case law demonstrates that the United States "need not show that a device is actually able to explode to prove that a defendant knowingly possessed an explosive under § 842(i)(1)," Second MTD at 4 (quoting United States v. Markey, 393 F.3d 1132, 1136 (10th Cir. 2004)), the same is not true for Second Amendment Constitutional analysis, which Teston asserts requires that a regulated firearm pose a threat of physical injury and be possessed by a "dangerous" individual, Second MTD at 4.  Here, Teston argues, "[m]ost of the black powder barely ignited, as indicated by the test burns conducted by law enforcement."

Second MTD at 4.   Accordingly, Teston argues, "[a]pplication of § 842(i) to Mr. Teston specifically is unconstitutional because, though he was a felon, he posed no colorable threat of violence or public injury through his possession of some black powder, small C02 cannisters, and wire."  Second MTD at 4.  Teston's second rationale is that, "[w]hile the regulation of possession of firearms may belong to the historical tradition identified by scholarship sources, it is clear from legislative history that the regulation of explosives does not."  Second MTD at 4.

Teston's alternative argument is that he is not the "dangerous" person who may have been prohibited historically from possessing firearms, because "his prior felony convictions were for nonviolent offenses."   Second MTD at 6.  Citing a dissenting opinion that the Honorable Amy Coney Barrett, then-United States Circuit Judge for the United States Court of Appeals for the Seventh Circuit, wrote, Teston states: "To the extent that there is an identifiable historical tradition of legislatures prohibiting dangerous people from possessing firearms, that tradition does not embrace non-violent offenders."  Second MTD at 6 (citing Kanter v. Barr, 919 F.3d 437, 451-69 (7th Cir. 2019)(Barrett, J., dissenting), abrogated by Bruen, 597 U.S. 1 (2022)).  Addressing some of his previous convictions, Teston argues that his conviction for controlled substances are nonviolent, and his Texas State aggravated assault conviction is not a crime of violence "because it can be committed with a *mens rea* of recklessness which, means that it is not categorically a crime of violence."  Second MTD at 6-7 (citing United States v. Gomez Gomez, 23 F.4th 575, 576-78 (5th Cir. 2022)(per curiam)(on remand from the Supreme Court)).  In sum, Teston states, "here the government cannot meet its burden of proving that the charged conduct is consistent with the nation's history of firearm regulation, and the regulation is unconstitutional as applied to Mr. Teston."  Second MTD at 7.

Following his Second Amendment argument, Teston contends that Count 2 and Count 3 fail to state an offense, because to sustain a conviction the United States must -- but cannot, according to Teston -- demonstrate Teston's intent to use the explosive materials as a weapon.  See Second MTD at 7-13.  This argument is premised on the notion that both of these Counts require the United States to prove that Teston either possessed (Count 2) or made (Count 3) an unregistered "firearm," as federal law defines that term.  See Superseding Indictment at 1-2.  From this premise, Teston notes that the materials in his possession may be considered a "firearm" under federal law, because of 26 U.S.C. § 5845, which states in relevant part:

> The term "firearm" means . . . (8) a destructive device.
>
> . . . .
>
> The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10, United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

26 U.S.C. § 5845(a), (f).  The crux of Teston's argument is that the United States' theory must be that Teston's explosive materials are a "destructive device" pursuant to 26 U.S.C. § 5845(f)(3), because, he contends, "[t]here is no evidence to suggest that Mr. Teston possessed anything like

an explosive, incendiary or gas bomb, as described in § 5645(f)(1)."  Second MTD at 12 n.3.[4]

Building on this notion, Teston asserts that

> the government cannot establish, as a matter of law, that Mr. Teston possessed the
> intent to render the items in his possession a "destructive device" subject
> to § 5841(a)'s registration requirement or regulated under § 5861(f).  There is no
> evidence that Mr. Teston intended to use the items in question as a weapon; indeed,
> the available evidence suggests the opposite.  He explained to law enforcement that
> he put some of the materials in gopher holes.

Second MTD at 12.  In short, Teston argues that the United States must show evidence of Teston's

subjective intent to use the materials as a weapon, and asserts that, because the United States cannot

show subjective intent, the charges must fail as matter of law.  See Second MTD at 7-13.

    The United States responds with the MTD Response.  See MTD Response at 1.  On the

Second Amendment argument, the United States begins by stating that "the Government

understands Defendant to be making an 'as-applied' challenge to the statute pursuant to the idea

that merely possessing black powder or components is unconstitutional."  MTD Response at 6

(quoting Second MTD at 3, 4).  Against this assertion, the United States argues that Teston

"misapprehends the particular circumstances of his own case," because Teston "did not just

possess some black powder and miscellaneous components; he possessed an assembled explosive

bomb."  MTD Response at 7.

    Aside from this argument, the United States offers three responses to Teston's Bruen

challenge:

> First, unlike the laws and regulations restricting handgun possession at issue in
> Bruen and [District of Columbia v. Heller, 554 U.S. 570, 635 (2008)("Heller")],
> possession of explosive devices falls more into the category of dangerous and

---

[4]Teston's citation to "§ 5645" in this quote is likely a typographical error, given that
elsewhere in the Second MTD he discusses only 26 U.S.C. § 5845.  See Second MTD at 7; id. at
8; id. at 9.  The Court therefore analyzes this argument under the assumption that he intends to
refer to 26 U.S.C. § 5845(f)(1).

> unusual weapons.  Second, this particular statute prohibits felons from possessing these items.  In <u>Heller</u> the Supreme Court emphasized that nothing in its opinion should cast doubt on the validity of prohibitions against felons possessing firearms.  <i>Bruen</i> does not change that.  Finally, even assuming Defendant was correct in contending this case involved the mere possession of black powder or other explosive materials, he is flatly incorrect in asserting that there is no historical tradition of regulating the possession of such materials.

MTD Response at 7.  On the first of these points, the United States argues that explosives and explosive materials are inherently dangerous, and, unlike handguns, "explosive bombs and materials are not weapons commonly possessed for lawful reasons."  MTD Response at 7 (quoting <u>United States v. Tagg</u>, 572 F.3d 1320, 1326 (11th Cir. 2009)).

On the second point, the United States also asserts that nothing in <u>Bruen</u> casts doubt on the proposition that, "the Second Amendment right to bear arms is limited to law-abiding and responsible citizens."  MTD Response at 8 (citing <u>Bruen</u>, 597 U.S. at 31-32; <u>Heller</u>, 554 U.S. at 635).  The United States contends that 18 U.S.C. § 922(g) -- which prohibits a felon's possession of a firearm -- remains Constitutionally viable after <u>Bruen</u>, <u>see</u> MTD Response at 8 (citing <u>Bruen</u>, 597 U.S. at 81 (Kavanaugh, J., concurring); <u>id.</u> at 72 (Alito, J., concurring)), and that, "[o]ther than the cursory statement that 922(g) and 842(i) 'are not grounded in the same historical justification,' . . . Defendant makes no argument as to why any of those differences would justify finding the dispossession of felons unconstitutional for an arguably more dangerous weapon, such as explosive bombs."  MTD Response at 8 (quoting Second MTD at 5).  Teston, the United States argues, is "a convicted felon multiple times over."  MTD Response at 8.

On the question of a historical analogue, the United States provides fifty pages of exhibits that it argues show that, "at least nine states or colonies had laws regulating gunpowder storage and possession" at the time of the founding, MTD Response at 10, and that "many colonial and early state governments prohibited the transportation, manufacture, or selling of gunpowder

without a license," MTD Response at 11.  While the United States acknowledges that these statues are "not 'historical twins' for § 842(i), they do not have to be."  MTD Response at 10 (quoting Bruen, 597 U.S. at 30).

Next, the United States addresses Teston's argument that 18 U.S.C. § 842 is unconstitutional as applied to him because Teston's prior convictions "were for, in Defendant's words, 'nonviolent offenses.'"  MTD Response at 10 (quoting Second MTD at 6).  The United States notes that one of Teston's prior convictions is for aggravated assault with a deadly weapon, and the "underlying factual allegation of that aggravated assault conviction involved Defendant punching and cutting his girlfriend with a knife."  MTD Response at 10.  The United States argues, moreover, that Teston provides no support for the proposition that "(a) it is unconstitutional to prohibit nonviolent felons from possessing firearms or (b) the category of nonviolent felonies should be defined by resort to the categorical approach."  MTD Response at 10-11.

Last, the United States responds to Teston's challenges to Counts 2 and 3.  See MTD Response at 12-13.  The United States' chief response to these challenges is that Teston possessed more than just materials to create an explosive device; "he made and possessed an assembled destructive device."  MTD Response at 12.  The United States argues that, pursuant to case law from the Tenth Circuit, see MTD Response at 12-13 (citing United States v. La Cock, 366 F.3d 883, 889 (10th Cir. 2004)), because "the government is not required to allege that the device was designed or redesigned for use as a weapon in the indictment, the Court should deny Defendant's argument on this point," MTD Response at 13.

Teston lodged a Reply to the Government's Response to Motion to Dismiss, filed April 14, 2023 (Doc. 50)("MTD Reply").  The MTD Reply focuses solely on Teston's Second Amendment argument and makes three points.  See MTD Reply at 1-6.  First, Teston argues that the United

States misunderstands his as-applied challenge to Count 1.  See MTD Reply at 1-3.  Teston states

that, while he agrees that "there are numerous constitutional applications of § 842(i)," MTD Reply

at 1, his case's facts are not among them, because "the government fails to explain how the items

in Mr. Teston's possession are unusually dangerous," MTD Reply at 2-3.  Second, he argues that

the United States "distorts the test announced in *Bruen*," MTD Reply at 3, because the question is

not whether there are founding-era regulations related to the storage and possession of gunpowder,

but rather whether there is "a historical tradition of disposing [sic] felons of the right to possess

such materials," MTD Reply at 4.  Last, Teston argues that, regarding the question whether Teston

is a violent or nonviolent felon, the proper inquiry -- as the Supreme Court mandates -- is the

"elements-based . . . categorical approach doctrine," and, under that analysis, he is a non-violent

felon, because his crime does not "categorically require violence."  MTD Reply at 5-6 (citing

Mathis v. United States, 579 U.S. 500, 512 (2016)).

The parties argued the Second MTD and the MTD Response on April 20, 2023.  See

Clerk's Minutes (dated April 20, 2023), filed April 20, 2023 (Doc. 71).  The parties began by

discussing an imminent Second Superseding Indictment that the United States planned to file, and

the United States noted that this new indictment would alter "counts 2 and 3 to clarify that we were

charging him with possessing and mak[ing] an assembled device," and that the new indictment

would be adding "a count of felon in possession of ammunition based on the smokeless powder

that was found in his vehicle and so there is an additional charge that will be count 4."  Draft

Transcript of April 20, 2023, Hearing (dated April 20, 2023) at 5:13-21 (McNair)("April 20 Tr.").[5]

Taking the Second MTD's arguments in reverse order, Teston presented his assertions related to

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

- 13 -

Counts 2 and 3, and the Court expressed concern that the specific type of explosive at issue in this case -- whether it is something akin to a "pipe bomb" or a small device used to kill rodents -- is likely a jury question: "[T]hat [is] going to be something that y'all are just going to have to argue to the jury about whether this is a device that falls within the statute or not." April 20 Tr. at 8:11-14 (Court). The Court stated its concern that a pretrial ruling on these issues would require it to make factual determinations. See April 20 Tr. at 10:23-11:1 (Court).

On the Second Amendment argument, the Court queried Teston whether the Second Amendment applies to explosives, and Teston responded that "I think the second amendment protects gun powder and what we're talking about here is at its essence [] gun powder." April 20 Tr. at 13:8-10 (Taylor). On the question of historical analysis and the nature of his as-applied challenge, Teston stated -- in a manner similar to this MTD Reply -- that "[t]he fact that there is some historical evidence of law regulating gun powder storage and possession and that Colonial and early state Government[]s had a licensing scheme applicable to gun powder does nothing to establish a historical tradition of disposing felons of the right to possess such materials." April 20 Tr. at 16:1-7 (Taylor). In addition, restating his argument from his MTD Reply, Teston argued that "[t]he best way to determine whe[ther] Mr. Teston belongs [to] the category of non[-]violent felons is the categorical approach." April 20 Tr. at 17:7-9 (Taylor).

Picking up on the question whether the explosive device -- or unassembled explosive device materials -- falls within the scope of the Second Amendment's protections, the United States argued:

> I guess I don't think it's necessary for the court to determine whether or not they're an arm for purposes of the second amendment, because the Court can make that determination. We can end up in the same place by saying it's a dangerous and unusual [weapon]. It's not something that is in common usage at the time and then if you look at the [Bruen] case, the [Bruen] case actually says . . . that weapons that are in common use for self-defense that's the central component of the second

amendment right.  [A]nd so you certainly don't have a history of individuals using bombs [for] self-defense purposes it's not like a handgun.

April 20 Tr. at 23:11-23 (McNair).  The United States also argued, in a manner similar to its contentions in the MTD Response, that nothing in <u>Bruen</u> "changed anything in the landscape for . . . felon [in ]possession."  April 20 Tr. at 26:6-7 (McNair).  The Court concluded the hearing on the MTD by stating that, at the time, it would be "very difficult for me to grant this motion," in large part because "there is too many factual issues," and, therefore, "I just don't think it's teed up yet."  April 20 Tr. at 28:21-23 (Court).

        2.      **<u>MTD for Prosecutorial Misconduct</u>**.

Teston filed the MTD for Prosecutorial Misconduct on May 5, 2023.  <u>See</u> MTD for Prosecutorial Misconduct at 1.  Teston cites the Fifth and Sixth Amendments to the Constitution of the United States as his legal basis for this motion to dismiss, and describes the circumstances surrounding the incident at issue "deeply concerning."  MTD for Prosecutorial Misconduct at 1. In essence, Teston contends that the Armijo Email is indicative of "a flagrant interference with Defendant's Sixth Amendment right to call a witness, Det. Nick Sanchez, on Defendant's behalf." MTD for Prosecutorial Misconduct at 3.  In particular, Teston emphasizes language from the Armijo Email in which Ms. Armijo states that Sanchez "is being uncooperative with us about meeting with him in person to pretrial.  I just had a very direct call with Capt. Lujan about him -- and told him we may not be taking any cases Federally from PPD unless their officers want to work with us."  Armijo Email at 1.[6]  Teston argues that this language is indicative of Ms. Armijo "threaten[ing] Det. Sanchez if he did not make himself available."  MTD for Prosecutorial

---

[6]Although the MTD for Prosecutorial Misconduct does not explain whom "Capt. Lujan" is, at the May 5, 2023, hearing, Teston stated that Captain Lujan is Sanchez' "supervisor."  Draft Transcript of May 5, 2023, Hearing at 16:8 (dated May 5, 2023)(Taylor).

Misconduct at 3.  Teston cites Tenth Circuit precedent for the proposition that "[p]rosecutorial misconduct interferes with a defendant's right to a fair trial where the government has threatened or intimidated a potential witness who otherwise would give material testimony that is favorable to the defense."  MTD for Prosecutorial Misconduct at 3 (citing United States v. Allen, 603 F.3d 1202, 1211 (10th Cir. 2010)).  Teston again labels Ms. Armijo's conduct as "prosecutorial misconduct of the most serious kind," MTD for Prosecutorial Misconduct at 3, and argues that, as a result of this conduct, "when Mr. Teston calls Det. Sanchez, short of an outright admission there will be no way to tell whether he was pressured directly and in person or indirectly through Capt. Lujan and by the threat of withdrawing federal prosecutorial resources from the good people of Portales, New Mexico."  MTD for Prosecutorial Misconduct at 4.  Moreover, Teston asserts, both Assistant United States Attorneys in this matter are "now both witnesses that can be subpoenaed to impeach any testimony that is inconsistent with the expected testimony from Det. Sanchez," because they can provide a "bias or motive" why Sanchez may have changed his story.  MTD for Prosecutorial Misconduct at 4.  This conduct, Teston concludes, "unquestionably interferes with Mr. Teston's right to a fair trial."  MTD for Prosecutorial Misconduct at 4.

The United States filed its MTD for Prosecutorial Misconduct Response on May 7, 2023. See MTD for Prosecutorial Misconduct Response at 1.  In the MTD for Prosecutorial Misconduct Response, the United States first notes that, following the Subjective Intent MOO, in which the Court concludes "that Teston's intent regarding possession of the alleged illegal material is not relevant to the current charges," MTD for Prosecutorial Misconduct Response at 2-3 (citing Subjective Intent MOO)(no page citation provided), Sanchez is "no longer a relevant witness in this case," MTD for Prosecutorial Misconduct Response at 3, because his statements relate only to Sanchez' conversation with Teston in which the latter told the former that "he possessed powder

and CO2 material[] to shoot into prairie dog holes," MTD for Prosecutorial Misconduct Response at 2.  Next, the United States contends that, although Teston argues that Ms. Armijo's actions in this case hampered or interfered with his defense efforts, "no[]where in the motion does Teston explain any efforts he has made to reach out to Detective Sanchez and how those efforts have been hampered by anything stated by AUSA Armijo in her e-mail."  MTD for Prosecutorial Misconduct Response at 3.  Additionally, the United States argues that Teston's assertions about the potential of calling the AUSAs in this case as witnesses is "deeply flawed," as "[t]he prosecutors would never be in a position to impeach Detective Sanchez' testimony with respect to the offenses charged in the indictment because they have no personal knowledge of any of the underlying facts."  MTD for Prosecutorial Misconduct Response at 5.  Last, the United States acknowledges that, "if Detective Sanchez testifies at trial, Teston should be allowed to cross examine him regarding any potential bias or motive he might have to testify favorably to the United States."  MTD for Prosecutorial Misconduct Response at 6.

The parties argued the MTD for Prosecutorial Misconduct on May 5, 2023.  See Clerk's Minutes (dated May 5, 2023), filed May 5, 2023 (Doc. 114).  At the hearing, Teston reaffirmed his argument regarding the matter's gravity, urging the Court to "take[] this matter very seriously," as the Armijo Email is indicative of "a clear message . . . sent to the Portales [Police] department that if they don't cooperate[,] if they don't show some enthusiasm for this prosecution that they're going to pull resources from prosecuting further cases in the future."  Draft Transcript of May 5, 2023, Hearing at 17:3-15 (dated May 5, 2023)(Taylor)("May 5 Tr.").  The Court inquired about what, in the wake of the Court's ruling in the Subjective Intent MOO, Sanchez would testify, see May 5 Tr. at 18:24-19:2 (Court), and Teston responded that Sanchez "could testify about . . . Mr. Teston's answers to his questions about the nature and characteristics of the device," May 5 Tr. at

- 17 -

19:10-12 (Taylor).  The Court expressed skepticism whether that testimony would be admissible, see May 5 Tr. at 19:13-25 (Court), and also stated that the whole issue "doesn't blip much on my radar," because it "sounds like internal prosecutorial politics," and that, if anything, "if Sanchez got admonished he may be ticked off at the United States for doing it," May 5 Tr. at 21:9-21 (Court).  The United States agreed with this assessment, stating that, at most, this conduct represents "a potential Giglio issue," and that, "if Officer Sanchez were to testify at trial, it would be fair to the defense to question him about any type of pressure he's received regarding his testimony."   May 5 Tr. at 22:24-23:4 (Ong).  The Court concluded the hearing on the MTD for Prosecutorial Misconduct by stating that it was going to deny the motion.  See May 5 Tr. at 25:19-23 (Court).

## LAW REGARDING MOTIONS TO DISMISS IN CRIMINAL CASES

The Federal Rules of Criminal Procedure contain no analogue for summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1293 (D.N.M. 2005)(Browning, J.)(noting that, in the criminal context, "[u]nder Tenth Circuit law, the Court is not free to determine, like on a motion for summary judgment under the Federal Rules of Civil Procedure, whether a genuine issue of material fact exists").  "Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion."  United States v. Hall, 20 F.3d 1084, 1087 (10th Cir. 1994).  When testing an indictment's sufficiency before trial, an indictment's allegations are taken as true, and courts should not consider evidence outside of the indictment. See United States v. Hall, 20 F.3d at 1087.  See also United States v. DeLeon, 287 F. Supp. 3d 1175, 1183 (D.N.M. 2017)(Browning, J.).  Accordingly, an indictment is legally sufficient so long as it:

> (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead an acquittal or conviction under the indictment as a bar to any subsequent prosecution for the same offense.

United States v. Hall, 20 F.3d at 1087.  The Tenth Circuit has recognized, however, an exception to that general rule for cases "where the underlying facts [are] essentially undisputed and the government fail[s] to object to the district court's resort to evidence beyond the four corners of the indictment."  United States v. Hall, 20 F.3d at 1087.  "Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt."  United States v. Hall, 20 F.3d at 1088 (emphasis in original).

The Federal Rules of Criminal Procedure permit defendants, however, to assert defects other than evidentiary insufficiency before trial, because rule 12(b) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  See Fed. R. Crim. P. 12(b)(1) advisory committee note to 2014 amendments ("The more modern phrase 'trial on the merits' is substituted for the more archaic phrase 'trial of the general issue.'  No change of meaning is intended." (source of quoted material not cited)).  Rule 12(b)(1)'s provision that, "Rule 47 applies to a pretrial motion," Fed R. Crim. P. 12(b)(1), means that the Court may consider evidence outside of the indictment, see Fed. R. Crim. P. 47(d) ("The moving party must serve any supporting affidavit with the motion.  A responding party must serve any opposing affidavit at least one day before the hearing, unless the court permits later service.").  On the other hand, rule 47(d) does not permit courts to conduct a "trial on the merits," Fed. R. Crim. P. 12(b)(1), via motion practice, because

> [t]he last sentence providing that a motion may be supported by affidavit is not intended to permit "speaking motions" (e.g. motion to dismiss an indictment for insufficiency supported by affidavits), but to authorize the use of affidavits when affidavits are appropriate to establish a fact (e.g. authority to take a deposition or former jeopardy).

Fed R. Crim. P. 47 advisory committee's note to 1944 Adoption.

A court can determine a pretrial motion without a trial on the merits when a motion goes to "what evidence might be admitted at trial . . . or the conduct of and preparation for trial." United States v. Pope, 613 F.3d 1255, 1260 (10th Cir. 2010)(Gorsuch, J.).   Rule 12(b)(1) contemplates pretrial motions that "seek and result in dismissal of the case altogether but that can be decided, at least in the circumstances of the case at hand, without deciding any disputed questions of fact about the circumstances of the alleged crime," i.e., motions that "involve only the taking of evidence that is 'entirely segregable from the evidence to be presented at trial.'" United States v. Pope, 613 F.3d at 1260 (quoting United States v. Barletta, 644 F.2d 50, 58 (1st Cir. 1981)).  See United States v. Olivas-Perea, 297 F. Supp. 3d 1191, 1208 (D.N.M. 2017)(Browning, J.)("To decide the MTD, the Court needs to determine only when, not whether, Olivas-Perea was found in the United States, so the Court faces a factual dispute that is peculiar to the MTD, and does not go to Olivas-Perea's guilt or innocence.").  Similarly, courts "may entertain motions that require it to answer only pure questions of law." United States v. Pope, 613 F.3d at 1260.

The "most prominent" reason for that rule is "respect for the role of the jury." United States v. Pope, 613 F.3d at 1259.[7]  The jury is charged with determining a defendant's guilt or innocence, so fact-finding "based on evidence that goes to this question can risk trespassing on territory reserved to the jury." United States v. Pope, 613 F.3d at 1259.  Criminal defendants are entitled to "'a jury determination that [they are] guilty of every element of the crime with which

---

[7]Other reasons for the rule include: (i) that evidence adduced at trial can provide a more certain framework for a court's analysis; (ii) that holding a separate mini-trial on a defense "only to repeat the exercise with largely the same evidence a short time later at the trial itself" disserves judicial economy; and (iii) that permitting pre-trial motions on matters to be presented at trial could "facilitate an end-run around the limited discovery rules governing criminal proceedings." United States v. Pope, 613 F.3d at 1259.

[they are] charged, beyond a reasonable doubt.'" Apprendi v. New Jersey, 530 U.S. 466, 477 (2000)(quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)). That entitlement extends to so-called "sentencing factors," i.e., facts, "[o]ther than the fact of a prior conviction," that increase "the penalty for a crime beyond the prescribed statutory maximum." Apprendi v. New Jersey, 530 U.S. at 490. See United States v. DeLeon, 287 F. Supp. 3d 1175, 1184-87 (D.N.M. 2017)(Browning, J.)(analyzing a motion to dismiss in the criminal context).

## LAW REGARDING THE SECOND AMENDMENT

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Although the Second Amendment is a now a well-known constitutional guarantee -- and the subject of contentious legal and political debate -- for most of its history, it was a relatively seldom-interpreted provision. See, e.g., United States v. Perez-Gallan, 640 F. Supp. 3d 697, 698 (W.D. Tex. 2022)(Counts, J.)("Before Bruen, the Second Amendment looked like an abandoned cabin in the woods."); Vincent v. Garland, 80 F.4th 1197, 1199 (10th Cir. 2023)("Vincent")("For over two centuries, the nature of this right was uncertain."). In the antebellum period, there was little judicial interpretation of the Second Amendment, as it was not thought that the Fourteenth Amendment incorporated the Second Amendment to apply to the States, and, until 1934, there was no significant federal gun control legislation. See William Baude & Robert Leider, The General Right to Bear Arms, 99 Notre Dame L. Rev (forthcoming 2024)(manuscript at 7-8); Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 58 Law & Contemp. Probs. 55, 58 (discussing the Nation Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934) ("National Firearms Act")); James O. Browning, 'Right to Bear Arms' Born of Natural Law, Albuquerque J., Dec. 9, 1991, at A1. Following the National Firearms Acts of 1934

-- through which Congress sought to regulate "certain firearms and machine guns," Pub. L. No. 73-474, 48 Stat. 1236 (1934) -- the Supreme Court decided its first major Second Amendment case, United States v. Miller, 307 U.S. 174 (1939)("Miller").   In Miller, the Supreme Court reviewed -- via direct appeal -- a ruling in which the Honorable Heartsill Ragon, United States District Judge for the Western District of Arkansas, dismissed an indictment brought under the National Firearms Acts because, Judge Ragon ruled, the relevant provision of the National Firearms Acts "is invalid in that it violates the Second Amendment to the Constitution of the United States." United States v. Miller, 26 F. Supp. 1002, 1003 (W.D. Ark. 1939)(Ragon, J.).  The Supreme Court reversed, holding that, "[i]n the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." Miller, 307 U.S. at 178.  The Supreme Court thus reversed and remanded the case for further proceedings.  See 307 U.S. at 183.

Following Miller, "the Second Amendment underwent a period of dormancy" until 2008, when the Supreme Court "overturned that dormancy in *District of Columbia v. Heller*."  Baude & Leider, The General Right to Bear Arms at 14, supra.  In Heller, 554 U.S. 570, the Supreme Court -- for the first time -- held that a law regulating firearms was unconstitutional under the Second Amendment, and clarified that the provision does not protect solely the right to have firearms for militia service, because "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." Heller, 554 U.S. at 627.  See id. at 580-81 ("Reading the Second Amendment as protecting only the right to 'keep and bear Arms' in

an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.'" (quoting U.S. Const. amend. II)).   In an opinion that the Honorable Antonin Scalia, Associate Justice of the Supreme Court, authored, the Supreme Court subjected the Second Amendment to a close textual analysis -- involving individual interpretation of the operative and prefatory clauses, see 554 U.S. at 576-600 -- and ultimately concluded that the District of Columbia's ordinance prohibiting, among other things, the possession of handguns in the home, is unconstitutional, see 554 U.S. at 635.   The Supreme Court concluded the Heller opinion by stating:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution.   The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see *supra,* [128 S.Ct. 2783,] 2816-2817, and n. 26. But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.   These include the absolute prohibition of handguns held and used for self-defense in the home.   Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem.   That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct.

554 U.S. at 636.   See McDonald v. City of Chicago, Ill., 561 U.S. 742, 750 (2010)("[W]e hold that the Second Amendment right is fully applicable to the States.").   In Heller's wake, lower courts struggled with how to apply Constitutional scrutiny in alleged violations of the Second Amendment's Constitutional guarantee.   See, e.g., United States v. Reese, 627 F.3d 792, 801 (10th Cir. 2010)("The Supreme Court did not specify in *Heller* precisely what level of scrutiny a reviewing court must apply to a challenged law.").   Some Courts of Appeals, like the United States Court of Appeals for the Third Circuit, concluded that, akin to the First Amendment to the Constitution of the United States, "the Second Amendment can trigger more than one particular standard of scrutiny" depending on the nature of the challenged government regulation.   United

States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010).  Following from this notion, many Courts of Appeals eventually coalesced around a "two step approach," in which a reviewing court first inquires whether (i) "the challenged law affects conduct that is protected by the Second Amendment," and if so, (ii) the court determines the appropriate level of constitutional scrutiny:

> If a regulation "amounts to a destruction of the Second Amendment right," it is unconstitutional under any level of scrutiny; a law that "implicates the core of the Second Amendment right and severely burdens that right" receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny.

Young v. Hawaii, 992 F.3d 765, 784 (9th Cir. 2021)(quoting Silvester v. Harris, 843 F.3d 816, 821 (9th Cir. 2016), cert. granted, judgment vacated, 142 S. Ct. 2895 (2022), and abrogated by Bruen, 597 U.S. 1).

In Bruen, the Supreme Court clarifies the approach to be taken when assessing a Constitutional challenge to firearm regulations under the Second Amendment, and expressly rejects the two-step approach and any balancing of government's interest in Second Amendment Constitutional analysis.  See Bruen, 597 U.S. at 17-24.  As the Honorable Clarence Thomas, Associate Justice of the Supreme Court, writes for the majority:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.  Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

Bruen, 597 U.S. at 19. As Justice Thomas explains, interest balancing is inapplicable in the Second Amendment context, because "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense."  597 U.S. at 26 (quoting Heller, 554 U.S. at

635)(emphasis in <u>Bruen</u> and <u>Heller</u>).  In place of the pre-<u>Bruen</u> two-step approach, the Supreme

Court in <u>Bruen</u> clarifies the correct approach -- also, alas, involving a two-step inquiry:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

<u>Bruen</u>, 597 U.S. at 24 (quoting <u>Konigsberg v. State Bar of Cal.</u>, 366 U.S. 36, 50 n.10 (1961)).

### 1.   <u>What Constitute "Arms" Under the Provision</u>.

The first step in <u>Bruen</u>'s mandated framework involves assessing whether "the Second

Amendment's plain text covers an individual's conduct."  <u>Bruen</u>, 597 U.S. at 24.  Part of this task,

necessarily, involves a determination what constitutes "Arms" for the Second Amendment's

purposes.  U.S. Const. amend. II.  <u>Bruen</u> instructs that, "[l]ike most rights, the right secured by the

Second Amendment is not unlimited," and is "not a right to keep and carry any weapon whatsoever

in any manner whatsoever and for whatever purpose."  597 U.S. at 21 (quoting <u>Heller</u>, 554 U.S. at

626).  More specifically, <u>Heller</u> provides that the Second Amendment "extends, prima facie, to all

instruments that constitute bearable arms, even those that were not in existence at the time of the

founding," 554 U.S. at 582, and similarly, that the provision protects "the sorts of weapons . . . 'in

common use at the time,'" 554 U.S. at 627 (quoting <u>Miller</u>, 307 U.S. at 179).  Justice Scalia notes

in <u>Heller</u> that, regarding the meaning of "Arms," the "18th-century meaning is no different from

the meaning today," and also adds that, "[t]he term was applied, then as now, to weapons that were

not specifically designed for military use and were not employed in a military capacity."  554 U.S.

at 581.  The Supreme Court in <u>Heller</u> also states that, "the Second Amendment does not protect

those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-

barreled shotguns," and that this notion "accords with the historical understanding of the scope of the right."  554 U.S. at 625.

These general principles can be difficult to apply case-by-case, and, consequently, lower courts have struggled with the Constitutional meaning of "Arms."  Recent cases, for example, analyze whether assault rifles are "Arms" within the Second Amendment's meaning, and courts have come to opposite conclusions on the question.  Compare Teter v. Lopez, 76 F.4th 938, 950 (9th Cir. 2023)(noting that, while Heller stated that a weapon's dangerous and unusual character is relevant to the historical tradition of its prohibition, "[i]t did not say that dangerous and unusual weapons are not _arms_")(emphasis in Teter v. Lopez), and Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec., 664 F. Supp. 3d 584, 595 (D. Del. 2023)(Andrews, J.)(concluding that assault rifles are "arms" in common use), with Bevis v. City of Naperville, Illinois, 85 F.4th 1175, 1195 (7th Cir. 2023)(contending that "_Heller_ itself stated that M16s are not among the Arms covered by the Second Amendment; they are instead a military weapon," and therefore holding that neither M16s nor AR-15s are "Arms" under the Second Amendment). Given, however, Heller's explicit statement that "short-barreled shotguns" do not fall under the scope of the Second Amendment's protections, 554 U.S. at 625, post-Bruen courts have found accordingly that such weapons fail at Bruen's first huddle, see United States v. Saleem, 659 F. Supp. 3d 683, 692 (W.D.N.C. 2023)(Whitney, J.)("In addressing [Bruen's] threshold question, the Court finds that the NFA's regulation of the conduct at issue here -- the possession of a short-barreled shotgun -- does not implicate conduct protected by the Second Amendment."); United States v. Royce, No.  CR 22-0130, 2023 WL 2163677, at *3 (D.N.D. February 22, 2023)(Hovland, J.)(noting that "there is no Second Amendment right to possess a short-barrel shotgun and a logical extension of that prohibition would encompass short-barrel rifles," and therefore declining to

conduct Bruen's historical tradition analysis).  Additionally, before Bruen, the Tenth Circuit held

that, like short-barreled shotguns, short-barreled rifles did not fall under the scope of the Second

Amendment's protection: "[W]e take our cue from *Heller* and conclude that the possession of

short-barreled rifles falls outside the Second Amendment's guarantee."  United States v. Cox, 906

F.3d 1170, 1186 (10th Cir. 2018).

These cases illustrate an important -- if somewhat banal -- point: just because a firearm

qualifies as a "firearm" under 26 U.S.C. § 5845, a statutory provision important in this subject area

because it is the National Firearms Act's definition section, does not mean necessarily that that it

falls under the Second Amendment's scope.  Indeed, the statutory definition states, among other

things, that "[t]he term 'firearm' means . . . a shotgun having a barrel or barrels of less than 18

inches in length," 26 U.S.C. § 5845(a), while Heller instructs that "the Second Amendment does

not protect those weapons not typically possessed by law-abiding citizens for lawful purposes,

such as short-barreled shotguns."  554 U.S. at 625.  Accordingly, despite its linguistic appeal, an

individual cannot argue, without more, that because federal statutory law defines an object as a

firearm, it must fall within the scope of the Second Amendment.  But cf. Vincent, 80 F.4th at 1203

(Bacharach, J., concurring)("There's no question about the applicability of the term *Arms*: The

federal ban[, 18 U.S.C. § 922(g)(1),] addresses firearms, which are considered *Arms* under the

Second Amendment.").

Relatedly, courts have concluded that many destructive devices -- although 26

U.S.C. § 5845 defines them as "firearms" -- do not fall within the Second Amendment's scope.

See United States v. Tagg, 572 F.3d 1320, 1326 (11th Cir. 2009); United States v. Sredl, No. CR

22-0071, 2023 WL 3597715, at *3 (N.D. Ind. May 23, 2023)(Miller Jr., J.).  In the only post-Bruen

case to consider squarely the question, the Honorable Robert Lowell Miller Jr., Senior United

States District Judge for the Northern District of Indiana, concludes that there is no Second Amendment right to possess or bear a "destructive device" as 26 U.S.C. § 5845(f) defines that term.  See 2023 WL 3597715, at *3.   Judge Miller reaches this conclusion by stating that, "[w]hatever changes N.Y. State Rifle v. Bruen brought to the Second Amendment landscape, inclusion of dangerous and unusual weapons in the Second Amendment right isn't one such change."  2023 WL 3597715, at *3.  He notes that, in Bruen, the Supreme Court affirms Heller's observation that the Second Amendment does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," 2023 WL 3597715, at *3 (quoting Heller, 554 U.S. at 625): "The Bruen court explained the exclusion of dangerous and uncommon weapons is one of the 'historical understanding[s]' that 'demark[s] the limits' on the right to armed self-defense," United States v. Sredl, 2023 WL 3597715, at *3 (quoting Bruen, 597 U.S. at 21)(brackets in original).  Judge Smith then states that 26 U.S.C. § 5845(f)'s description of "destructive device[s]" contemplates "weapons capable of vast and indiscriminate destruction." 2023 WL 3597715, at *3 (citing 26 U.S.C. § 5845(f)).  He concludes:

> For the same reason as there's no right to possess a short-barrel shotgun -- it's "not typically used by law-abiding citizens for lawful purposes[,]" District of Columbia v. Heller, 554 U.S. at 624 . . . -- there is no Second Amendment right to possess dangerous and unusual weapons in the form of "destructive devices" or "any other weapon."

2023 WL 3597715, at *3 (brackets added).

The leading pre-Bruen case on whether a destructive device falls under the Second Amendment is United States v. Tagg, 572 F.3d 1320 (11th Cir. 2009)("Tagg").  In Tagg, in an opinion that the Honorable Peter Fay, United States Circuit Judge for the Eleventh Circuit, authored, the Eleventh Circuit concludes that the Second Amendment does not protect an "unregistered destructive device" -- in that case, a "pipe bomb."  572 F.3d at 1322.  The Eleventh

Circuit also reached this conclusion based on <u>Heller</u>'s language that, "'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.'"  <u>Tagg</u>, 572 F.3d at 1326 (quoting <u>Heller</u>, 554 U.S. at 625).  The Eleventh Circuit then states that, "[a]pplying *Heller* to the facts of this case, we conclude that the pipe bombs at issue were not protected by the Second Amendment," because, "[u]nlike the handguns in *Heller*, pipe bombs are not typically possessed by law-abiding citizens for lawful purposes."  <u>Tagg</u>, 572 F.3d at 1326.

### 2.    Historical Analysis and Analogical Reasoning.

To apply faithfully <u>Bruen</u>'s standard, courts, after determining that the pertinent weapon comes within the Second Amendment's protections, necessarily must look to "the Nation's historical tradition of firearm regulation" and assess whether a challenged regulation is "consistent" with that tradition.  <u>Bruen</u>, 597 U.S. at 24.  In <u>Bruen</u>, the Supreme Court instructs that this task often involves "reasoning by analogy," which the Supreme Court notes is "a commonplace task for any lawyer or judge."  597 U.S. at 28.  This instruction flows from a general recognition that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."[8]  597 U.S.

---

[8]The Honorable Amy Coney Barrett, Associate Justice of the Supreme Court, notes in her concurring opinion in <u>Bruen</u> that the majority opinion "avoids" answering the question whether, when undertaking this historical analysis, courts should "'primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791."  597 U.S. at 82 (Barrett, J., concurring)(quoting <u>Bruen</u>, 597 U.S. at 37).  On this question, the Court concludes that 1791 -- or the Founding Era -- is the relevant historical time-period on which to base this Constitutional analysis.  The Court recognizes that there is some intuitive appeal to the idea that State-level firearm restrictions should be analyzed according to the Constitutional understandings of 1868 -- i.e., when the Fourteenth Amendment's Due Process Clause (or its Privileges and Immunities Clause) made possible the selective application of the Bill of Rights to the States.  <u>See</u>, <u>e.g.</u>, Akhil Reed Amar, <u>The Bill of Rights: Creation and Reconstruction</u> at 223 (1998)(arguing that "the very same words 'the right . . . to keep and bear arms' take on a different coloration and nuance when they are relabeled

at 27.  The Supreme Court observes that analogical reasoning must be employed to determine whether a modern regulation is "consistent" with a historical analogue, and, "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  597 U.S. at 28-29 (quoting Cass Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).  As the Supreme Court concludes, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  Bruen, 597 U.S. at 30 (emphasis in Bruen).

---

'privileges or immunities of citizens' rather than 'the right of the people,' and when they are severed from their association with a well-regulated militia," and, accordingly, "the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789"); Timbs v. Indiana, 139 S. Ct. 682, 687 (2019)("With only 'a handful' of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States." (quoting McDonald, 561 U.S. at 765)).  While this temporal-historical question is interesting from a theoretical perspective, on a basic level, there is -- textually -- only one Second Amendment, and, as the Supreme Court has noted, the Bill of Rights provisions are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment."  Malloy v. Hogan, 378 U.S. 1, 10 (1964).  See Ramos v. Louisiana, 140 S. Ct. 1390, 1397 (2020)("This Court has long explained, too, that incorporated provisions of the Bill of Rights bear the same content when asserted against States as they do when asserted against the federal government.").  It is the Court's duty to apply faithfully precedent from the Supreme Court, and the Court understands the statements in Malloy v. Hogan, 378 U.S. at 10, and Ramos v. Louisiana, 140 S. Ct. at 1397, to instruct that federal Constitutional rights are imposed identically on the States as they are on the United States.  Any other approach is not incorporating the Bill of Rights, but rather something else -- namely, incorporating caselaw and legal understandings as they existed during Reconstruction.  In any case, a patchwork approach to incorporation is no way to run a railroad.  Finally, the Constitution's "meaning is fixed according to the understandings of those who ratified it."  Bruen, 597 U.S. at 3.  Accordingly, to determine the meaning of the Second Amendment, the Court looks to the understanding of those who ratified it: the First United States Congress, who approved the Second Amendment in 1789, before its eventual ratification in December of 1791.

3.     **The Second Amendment and 18 U.S.C. § 922(g)(1).**

Since 1968, federal law has prohibited individuals who have been convicted of felonies from possessing firearms.  See Gun Control Act of 1968, Pub L. No. 90-618, § 922(h)(1), 92 Stat. 1213, 1220 (codified as amended at 18 U.S.C. § 922(g)(1)).  Following Heller, the Tenth Circuit considered a Second Amendment challenge to this prohibition in United States v. McCane, 573 F.3d 1037 (10th Cir. 2009).   In that case, the Tenth Circuit relied on language from Heller to conclude that 18 U.S.C. § 922(g)(1) is Constitutional.  See United States v. McCane, 573 F.3d at 1047.  In a terse analysis, the Tenth Circuit notes that "[t]he Supreme Court . . . explicitly stated in *Heller* that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'"  United States v. McCane, 573 F.3d at 1047 (quoting Heller, 554 U.S. 626).  On the basis of this language, the Tenth Circuit in United States v. McCane determines that 18 U.S.C. § 922(g)(1) is Constitutional under the Second Amendment.  See 573 F.3d at 1047.

Following Bruen, the Tenth Circuit was asked to revisit and reconsider this holding in light of the new test in Bruen.  See Vincent, 80 F.4th at 1199.  In Vincent, the Tenth Circuit first notes that "the emergence of a new test doesn't necessarily invalidate our earlier precedent" and, thus, to determine United States v. McCane's continuing viability as Tenth Circuit law, the Tenth Circuit must consider "whether *Bruen* indisputably and pellucidly abrogated *McCane*."  Vincent, 80 F.4th at 1200 (citing Barnes v. United States, 776 F.3d 1134, 1147 (10th Cir. 2015)).  In an opinion authored that the Honorable Robert E. Bacharach, United States Circuit Judge for the Tenth Circuit, authored, the Tenth Circuit determines that Bruen does not abrogate United States v. McCane, because, in Bruen, "the [Supreme] Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons," and, if anything,

Bruen "contains two potential signs of support for these prohibitions."  Vincent, 80 F.4th at 1201.

First, the Tenth Circuit notes, "six of the nine Justices pointed out that *Bruen* was not casting any

doubt on" Heller's language regarding the longstanding prohibitions regarding felons in possession

of firearms.  Vincent, 80 F.4th at 1201.  Second, the Tenth Circuit observes that "*Bruen* apparently

approved the constitutionality of regulations requiring criminal background checks before

applicants could get gun permits" and that, in so doing, "the [Supreme] Court arguably implied

that it was constitutional to deny firearm licenses to individuals with felony convictions."  Vincent,

80 F.4th at 1201-02.  For these two reasons, the Tenth Circuit determines that nothing in Bruen

abrogates United States v. McCane's holding and thus that case remains Tenth Circuit law.  See

Vincent, 80 F.4th at 1202.  As a final wrinkle, the Tenth Circuit in Vincent disagrees with the

appellant-defendant's argument that the "nonviolent" nature of her felony also contributed to the

unconstitutionality of 18 U.S.C. § 922(g)(1) as applied to her, because United States v. McCane

contains no such rule: "Under *McCane*, we have no basis to draw constitutional distinctions based

on the type of felony involved."  Vincent, 80 F.4th at 1202.

## LAW REGARDING RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion

of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d

1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence

is evidence that has a tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence."

United States v. Gutierrez-Castro, No. CR 10-2072, 2011 WL 3503321, at *3 (D.N.M. August 6,

2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: **(a)** it has any tendency to

make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of

consequence in determining the action.")).   "Rule 401 contains a low threshold for relevance, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United States v. Goxcon-Chagal, 885 F. Supp. 2d 1118, 1162 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).   Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.   See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING PROSECUTORIAL MISCONDUCT THROUGH INTERFERENCE WITH DEFENSE WITNESSES

Prosecutorial misconduct is a capacious concept with various manifestations. See, e.g., Bank of Nova Scotia v. United States, 487 U.S. 250, 252 (1988)(discussing prosecutorial misconduct before a grand jury); Caldwell v. Mississippi, 472 U.S. 320, 336 (1985)(discussing prosecutorial misconduct in misstating the law in argument to the jury); Donnelly v. DeChristoforo, 416 U.S. 637, 638 (1974)(discussing prosecutorial misconduct stemming from a prosecutor's remarks during closing argument);  Douglas v. Workman, 560 F.3d 1156, 1192 (10th Cir. 2009)(discussing "[t]he prosecutor's knowing use of false testimony" as prosecutorial misconduct).  As the Honorable John Paul Stevens, Associate Justice of the Supreme Court, wrote: "Like the Hydra slain by Hercules, prosecutorial misconduct has many heads."  United States v. Williams, 504 U.S. 36, 60 (1992)(Stevens, J., dissenting).  Tasked with the awesome power of enforcing the United States' laws -- or, in the case of State-level prosecutors, the individual States' laws -- it is as much the duty of a prosecutor "to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935).

One improper prosecutorial method involves interference with a defendant's witnesses. See United States v. Baca, 447 F. Supp. 3d 1149, 1219 (D.N.M. 2020)(Browning, J.)("The Court

can find a due process violation . . . where the United States 'substantially interfere[s] with a defense witness's decision to testify.'" (quoting United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005))(alterations in United States v. Baca), aff'd sub nom. United States v. Cordova, 25 F.4th 817 (10th Cir. 2022)); 6 Wayne R. LaFave, Jerod H. Israel, Nancy J. King & Orin S. Kerr, Criminal Procedure § 24.3(h)(4th ed. 2023)("LaFave")(stating that "due process . . . comes into play when the court or prosecution takes steps that undermine the defense's ability to utilize the subpoena authority to gain testimony at trial").   As the above-quoted sources indicate, prosecutorial misconduct of this nature is understood generally to be rooted in Constitutional concerns related to due process, see Lafave § 24.3(h), although the Sixth Amendment's Compulsory Process Clause also may inform the analysis of a prosecutor's interference with defense witnesses, see United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)(analyzing the Compulsory Process Clause in a case involving allegations that the United States deported witnesses who would have been favorable to the defendant's defense).   This guarantee forms part of defendant's general right to present a complete defense.   See Washington v. Texas, 388 U.S. 14, 19 (1967)("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense."); Crane v. Kentucky, 476 U.S. 683, 690 (1986)("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)); United States v. Pablo, 696 F.3d 1280, 1295 (10th Cir. 2012)("An essential ingredient to a fair trial is the defendant's right to present a defense.").

In the Tenth Circuit, to prevail on an allegation of prosecutorial misconduct based on interference with defense witnesses, the defendant must "provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material." United States v. Allen, 603 F.3d 1202, 1211 (10th Cir. 2010)(citing Griffin v. Davies, 929 F.2d 550, 553 (10th Cir. 1991)[9]).   Moreover, the interference with the witness must be "substantial," and "[i]nterference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." United States v. Serrano, 406 F.3d at 1216 (citing United States v. Smith, 997 F.2d 674, 680 (10th Cir. 1993)).  The Tenth Circuit has found no prosecutorial misconduct where "the prosecutor merely raised his concern to the district court that the testimony of these two witnesses could lead to their prosecution." United States v. Pablo, 696 F.3d at 1296.  See United States v. Serrano, 406 F.3d at 1216 ("The prosecutor did not act in bad faith when he notified the court that the witnesses' testimony could subject them to prosecution for misprision of felony or possession of an unregistered illegal firearm.").  But see United States v. Fred, No. CR 05-0801, 2006 WL 4079619, at *4 (D.N.M. December 4, 2006)(Browning, J.)("[T]he prosecutor must not obstruct communications between witnesses and defense counsel -- and 'it is unprofessional conduct for the prosecutor to advise a prospective witness to decline to give the defense information that person has a right to give.'" (quoting United States v. Carrigan, 804 F.2d 599, 603 (10th Cir. 1986))).

---

[9]Apropos of the Court's discussion above regarding the Constitutional origin of this type of prosecutorial misconduct, the Court notes that Griffin v. Davies describes the violation at issue as "a fourteenth amendment due process violation based on the denial of the right to compulsory process." Griffin v. Davies, 929 F.2d at 553 (citing United States v. Valenzuela-Bernal, 458 U.S. at 867).

<u>ANALYSIS</u>

The Court denies the MTD, the Second MTD, and the MTD for Prosecutorial Misconduct. Regarding the Second Amendment arguments in the MTD and the Second MTD, the Court concludes that Teston's Second Amendment arguments are not persuasive, because: (i) Teston's destructive device does not fall within the Second Amendment's scope; and (ii) 18 U.S.C. § 842(i)'s prohibition on felon in possession of explosives is commensurate with the "longstanding prohibitions on the possession of firearms by felons" that are Constitutionally valid under the Second Amendment.  <u>Heller</u>, 554 U.S. 626.  <u>See</u> <u>Vincent</u>, 80 F.4th at 1201-02.  Next, the Court concludes that, consistent with the Court's ruling in the Subjective Intent MOO, the United States has alleged adequately an offense under 26 U.S.C. § 5841, because Teston's device is a "destructive device" under 26 U.S.C. § 5845(f)(1).  As for the MTD for Prosecutorial Misconduct, the Court concludes that Ms. Armijo's conduct in the Armijo Email does not rise to the level of substantial interference with a potential witness, and, in any event, Teston had not demonstrated that Sanchez can provide testimony that is material.  The Court discusses each conclusion in turn.

I.      **TESTON'S CHARGE UNDER 18 U.S.C. § 842(i) DOES NOT VIOLATE THE SECOND AMENDMENT, BECAUSE THE SECOND AMENDMENT'S PLAIN TEXT DOES NOT COVER TESTON'S CONDUCT, AND, MOREOVER, <u>VINCENT</u> AFFIRMS THE CONSTITUTIONALITY OF FELON IN POSSESSION RESTRICTIONS.**

In the MTD and the Second MTD, Teston contends that 18 U.S.C. § 842(i) is unconstitutional as applied to his case, because: (i) "[t]he history of regulating possession of firearms by dangerous persons does not include possession of the 'explosives' Mr. Teston had," Second MTD at 3 (source of quoted material not cited), and (ii) 18 U.S.C. § 842(i)'s prohibition on possession of explosives by felons Constitutionally cannot apply to him, because "his prior felony convictions were for nonviolent offenses," Second MTD at 6.  In forwarding these

contentions in an as-applied posture, Teston asks the Court to look at his case's specifics, and determine that a conviction under 18 U.S.C. § 842(i) Constitutionally would be impermissible. The Court disagrees with both of Teston's arguments regarding the Second Amendment.

A.  **TESTON'S CONDUCT DOES NOT FALL UNDER THE SECOND AMENDMENT'S PLAIN TEXT, BECAUSE, ALTHOUGH HE IS A "PERSON" UNDER THE PROVISION, HIS PIPE BOMB IS NOT AN "ARM[]" WHICH THE SECOND AMENDMENT PROTECTS.**

As noted, Teston's first argument is that "[t]he history of regulating possession of firearms by dangerous persons does not include possession of the 'explosives' Mr. Teston had."  Second MTD at 3 (source of quoted material not cited).  The Court notes that, by framing his argument in terms of a historical tradition of firearm regulation, Teston skips the first step of Bruen's mandated two-step analysis.  Indeed, as discussed, see Law Regarding the Second Amendment, supra at 21-32, Bruen instructs that, when assessing the constitutionality of a firearm regulation under the Second Amendment, a court must undertake the following sequential inquiry:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Bruen, 597 U.S. at 24 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)). Accordingly, before the Court considers whether "[t]he history of regulating possession of firearms by dangerous persons does not include possession of the 'explosives' Mr. Teston had," Second MTD at 3 (source of quoted material not cited), the Court first must assess step one, i.e., whether "the Second Amendment's plain text covers [Teston's] conduct," Bruen, 597 U.S. at 24.  In Bruen, the Supreme Court performed step one's initial analysis as follows:

> It is undisputed that petitioners Koch and Nash -- two ordinary, law-abiding, adult citizens -- are part of "the people" whom the Second Amendment protects.

See *Heller*, 554 U.S. at 580 . . . . Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id.*, at 627 . . . ; see also *Caetano*, 577 U.S. at 411-412 . . . . We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct -- carrying handguns publicly for self-defense.

*Bruen*, 597 U.S. at 31-32. This analysis suggests that there are, generally speaking, three sub-inquiries that inform step one's inquiry whether "the Second Amendment's plain text covers an individual's conduct." *Bruen* 597 U.S. at 24. Namely, the three sub-inquiries are: (i) whether the individual is part of "the people" under the Second Amendment, U.S. Const. amend. II; (ii) whether the object or device in question is an "Arm[]" within the Second Amendment's meaning, U.S. Const. amend. II; and, (iii) whether the Second Amendment's plain text protects the "course of conduct" that the individual in question wishes to undertake with that object or device, *Bruen*, 597 U.S. at 31-32. See *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023)(observing that "*Bruen* step one . . . requires a textual analysis, determining whether the challenger is 'part of the people whom the Second Amendment protects,' whether the weapon at issue is 'in common use today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment" (quoting *Bruen*, 597 U.S. at 31-32)). The Court concludes that Teston's challenge fails sub-inquiry two of *Bruen*'s first step.

### 1.   Teston Falls Under "The People" as the Second Amendment Contemplates.

The question at issue in the first sub-inquiry -- i.e., whether Teston is a part of "the people" under the Second Amendment -- is thornier than one might assume. While Teston is undoubtedly a person in the conventional sense of the word, there is some debate in both the case law and the relevant scholarship regarding whether convicted felons -- like Teston -- are part of "the people" under the Second Amendment. See *Vincent*, 80 F.4th 1203 (Bacharach, J., concurring)(noting that "[t]he answer is debatable" whether "the term *the people* include[s] individuals convicted of

nonviolent felonies")(emphasis in Vincent); Range v. Att'y Gen. United States of Am., 69 F.4th

96, 103 (3d Cir. 2023)(concluding that individuals convicted of "felony-equivalent" crimes "are

counted among 'the people' protected by the Second Amendment").   Bruen arguably suggests that

felons are not "people" under the Second Amendment: as quoted above, the Supreme Court states

in its analysis that, "petitioners Koch and Nash -- two ordinary, law-abiding, adult citizens -- are

part of 'the people' whom the Second Amendment protects."  Bruen, 597 U.S. at 31-32 (source of

quoted material not cited, but presumably U.S. Const. amend. II).   Indeed, as Judge Bacharach

notes in his concurring opinion in Vincent, throughout the Bruen opinion, the Supreme Court refers

"fourteen times to the Second Amendment's protection of *law-abiding citizens*."  Vincent, 80 F.4th

1203 (Bacharach, J., concurring)(citing Bruen, 597 U.S. at 8, 9, 29, 30, 33 n.8, 38, 38 n.9, 60,

71)(emphasis in Vincent).

As Judge Bacharach notes, however, this interpretation of the Second Amendment's "the

people" -- one that does not include individuals convicted of felonies -- is seemingly at odds with

Heller's language, which suggests that that phrase in the Second Amendment, like other references

to "the people" in the Constitution, "unambiguously refers to all members of the political

community, not an unspecified subset."  Heller, 554 U.S. at 580.  See id. at 580 (quoting United

States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990), where the Supreme Court concluded that

the term "the people" has a common meaning throughout various parts of the Bill of Rights);

Heller, 554 U.S. at 581 ("We start therefore with a strong presumption that the Second Amendment

right is exercised individually and belongs to all Americans.").   In addition to this Heller language,

moreover, the Court also finds persuasive an observation by the Third Circuit, that "the criminal

histories of the plaintiffs in *Heller, McDonald*, and *Bruen* were not at issue in those cases," and

thus, accordingly, "their references to 'law-abiding, responsible citizens' were dicta."  Range v.

Att'y Gen. United States of Am., 69 F.4th at 101 (source of quoted material not cited). Given that these statements about individuals being "law abiding" did not affect the outcome of these cases, the Court agrees with the Third Circuit that it ought not to "overread" these references to impose a hard-and-fast rule regarding the meaning of an otherwise seemingly inclusive Constitutional term. Range v. Att'y Gen. United States of Am., 69 F.4th at 101. The Court thus concludes that Teston is part of "the people" whom the Second Amendment protects. See Bruen, 597 U.S. at 31-32. Although Teston is an individual convicted of a felony, this fact does not render him outside the scope of the Second Amendment's reference to "the people," because the Court concludes that the most direct guidance provided by the Supreme Court indicates that this term should be read broadly to apply to all people in the political community. U.S. Const. amend. II.[10]

## 2.   Teston's Homemade Pipe Bomb is Not an "Arm[]" Under the Second Amendment.

The second sub-inquiry in Bruen's threshold, plain-text inquiry is whether the object or device being regulated is an "Arm[]" under the Second Amendment. U.S. Const. amend. II. See United States v. Alaniz, 69 F.4th at 1128 (stating that the second inquiry of "Bruen step one" is a determination "whether the weapon at issue is 'in common use today for self-defense'" (quoting Bruen, 597 U.S. at 31-32)).[11]  As noted, in Bruen, the Supreme Court decides that the weapons at

---

[10]The Court emphasizes that this conclusion -- that Teston is part of "the people" whom the Second Amendment protects -- does not mean that Teston's felony status is irrelevant to the analysis in this case. Analysis related to Teston's felony status is discussed below. See Analysis Section I(B), infra at 50-54.

[11]The Court has concern about the role that "self-defense" -- and "quintessential self-defense weapon[s]," Heller, 554 U.S. at 629 -- play in contemporary Second Amendment jurisprudence. The Supreme Court has given the concept of self-defense, and its purported centrality to the Second Amendment, significant emphasis in recent times. See, e.g., Bruen, 597 U.S. at 29 ("As we stated in Heller and repeated in McDonald, 'individual self-defense is 'the central component' of the Second Amendment right." (quoting McDonald v. City of Chicago, Ill., 561 U.S. at 767)(emphasis in Bruen). Although the Supreme Court in Heller purports to anchor

this weapons-used-for-self-defense in the pre-ratification history of the Amendment -- the codification of a "*pre-existing* right," Heller, 554 U.S. at 592 -- the Supreme Court's analysis is most persuasive on the idea that the Second Amendment codifies a right that "enable[s] individuals to defend themselves," Heller, 554 U.S. at 592, but not necessarily that individual self-defense was central to the right.  This difference is important, and has -- arguably -- led to the over-emphasis on individual self-defense in Second Amendment Constitutional law.  See Baude & Leider, The General Right to Bear Arms at 27 (noting that, "[h]istorically, constitutionally protected 'arms' were those arms particularly appropriate for defense of the community" and that "[w]eapons of purely private conflict . . . were not protected," and that judicial confusion on this question is because of "[b]ad analogizing . . . perhaps exacerbated by some inaccurate dicta in Heller"); William G. Merkel, Uncoupling the Constitutional Right to Self-Defense from the Second Amendment: Insights From the Law of War, 45 Conn. L. Rev. 1809, 1820-21 (2013)("The original public meaning methodology by the Court in Heller and McDonald does not correlate well with the nonmilitia-linked right to armed private self-defense voted into life by a one justice majority in each case.").  While the Supreme Court's limitation of the Second Amendment to individual self-defense may be more politically correct to an active Supreme Court on this issue, this limitation is not based on sound historical analysis or sound originalist reasoning.  The Supreme Court's current interpretation simultaneously overprotects and underprotects what the drafters meant to protect.  This is due, in part, to the somewhat awkward manner in which incorporation affects the Second Amendment guarantee.  To understand why, the Court explains the nature of the individual right protected by the Second Amendment.

The right to bear arms was not born solely -- or even significantly -- out of a concern in protecting individual "self-defense," but as part of a natural pre-existing right, which English law recognized, to resist against oppressive or ineffectual government.  See Browning, 'Right to Bear Arms' Born of Natural Law, Albuquerque J., Dec. 9, 1991, at A1; Amar, The Bill of Rights: Creation and Reconstruction at 46 (noting that the Second and Third Amendments, like "rights of the people to petition and assemble in conventions," are "intimately bound up with the people's transcendent right to alter or abolish their government").  As Blackstone states, the "right of having arms" is rooted in "the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."  1 William Blackstone, Commentaries at *139-40.  As Professor Amar notes, at the time of the Founding, the Second Amendment's words had resonance with the violent political struggles of then-recent history, federalism concerns, and populism.  See Amar, The Bill of Rights: Creation and Reconstruction at 46-59.  Indeed, many Anti-Federalists at the time of ratification saw the right protected by the Second Amendment as part of a broader check on the ominous specter of an abusive and self-interested central government:

> An aristocratic central government, lacking sympathy with and confidence from ordinary constituents, might dare to resist -- especially if that government were propped up by a standing army of mercenaries, vagrants, convicts, aliens, and the like.  Only an armed populace could deter such an awful spectacle.  Hence the need to bar Congress from disarming freemen.  Thus the Second Amendment was closely linked to the textually adjoining First Amendment's guarantees of assembly and petition.  One textual tip-off is the use of the magisterial Preamble phrase "the people" in both contexts, thereby conjuring up the Constitution's grand principle of

popular sovereignty and its concomitant popular right to alter or abolish the national government.  More obvious is the preamble to the Second Amendment itself, and its structural concern with democratic self-government in a "free State."

. . . .

History also connected the right to keep and bear arms with the idea of popular sovereignty.  In Locke's influential *Second Treatise of Government*, the people's right to alter or abolish tyrannous government invariably required a popular appeal to arms.[]  To Americans in 1789, this was not merely speculative theory.  It was the lived experience of their age.  Beginning with the shot heard round the world, when British soldiers met armed Massachusetts minutemen at Lexington and Concord, Americans had seen the Lockean words of the Declaration of Independence -- affirming "the Right of the People to alter or abolish" oppressive government -- made flesh (and blood) in a Revolution wrought by arms.  Thus when Pendleton trumpeted the right of the people to assemble in convention as the answer to any federal misbehavior, Patrick Henry rose up to offer a more bleak assessment: "O sir, we should have fine times, indeed, if, to punish tyrants, it were only sufficient to assemble the people!  Your arm, wherewith you could defend yourselves, are gone . . . ."[]

. . . .

But to see the un-Reconstructed amendment as primarily concerned with an individual right to protect one's home is like viewing the heart of the speech and assemble clauses as the right of persons to meet to play bridge or have sex.

Amar, The Bill of Rights: Creation and Reconstruction at 47-49.  The Second Amendment, while it protects individual rights, also is addressing a collective of people -- militia -- with arms.  When one reads the Second Amendment's plain text, the idea of self-defense does not leap off the page as much as the idea that arms might be used for collective defense, and, if necessary, rebellion against tyranny.

While in practice, American courts, and especially the federal judiciary, which is part of a structure of a federal government based on a document that all judges and justices have sworn to uphold, do not like to talk about the right to rebel, the reality is that -- like jury nullification -- it is part of the constitutional DNA of our Nation.  See United States v. Courtney, 960 F. Supp. 2d 1152, 1164 (D.N.M. 2013)(Browning, J.)(discussing the Founding Era-origins of jury nullification).  In any case, while it is illegal to rebel, just because the right to rebel is not available and cannot co-exist with an ordered government, the status of the Constitutional right to bear arms still should be understood and defined based on whether an arm would be "particularly appropriate for defense of the community" and useful to a right to rebel -- not using the more narrow individual right that the Supreme Court has invented and is using without much historical, textual, and originalist mooring.  Baude & Leider, The General Right to Bear Arms at 27.  The Court, writing on a blank slate, would stay away from Second Amendment understandings of "Arms" that rely on whether a weapon is useful for self-defense.  U.S. Const. amend. II.

- 42 -

While the Court agrees with the result in Heller and the Supreme Court's finding of an individual right, see Heller, 554 U.S. at 595, the Court still thinks -- as it did over three decades ago -- that the Second Amendment should not be incorporated on the States through the Fourteenth Amendment, see Browning, 'Right to Bear Arms' Born of Natural Law, Albuquerque J., Dec. 9, 1991, at A6 ("States and municipalities, however, would not be limited by the Second Amendment from imposing any limitations that its citizens desire on the right to bear arms."). Incorporation has distorted the Second Amendment's original meaning, because the Founders did not think that the Second Amendment applies to the States and localities, and it does not apply easily. See Amar, The Bill of Rights: Creation and Reconstruction at 215-18. It is best to leave the States and localities alone, and not preempt local gun regulations, even as misguided and ineffective as many of these local regulations are. There is no historical, textualist, or originalist evidence that supports that "the people" in Pennsylvania and Virginia were concerned that their State governments were going to take away their guns; the people's concern was that the new national government would take away their arms. In sum, the Supreme Court should let the States and localities regulate guns if they choose, but broaden the definition of "Arms" that Congress can not regulate. Such a definition would be more consistent with federalism, history, and original meaning than the two wrong interpretations that the Supreme Court has made in this area.

Any time the Supreme Court incorporates a right and applies that right to the States, it is in tension with federalism and moves issues from the political process to the courts. Sometimes, that step is necessary, as was the case with the Civil War amendments, because States in the South had failed to protect a group of people on the basis of their race. Other times, taking an area of law and Constitutionalizing it should be done with great caution, because it can have enormous consequences. See Roe v. Wade, 410 U.S. 113 (1973)(Constitutionalizing State abortion law at the very time States were liberalizing State abortion law, and spawning a profound realignment in American politics and religion that is still ongoing, and then having a subsequent Supreme Court decades later say, "never mind," leave it to the States after all); Robin West, From Choice to Reproductive Justice: De-Constitutionalizing Abortion Rights, 118 Yale L.J. 1394 (2009); Ruth Bader Ginsburg, Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade, 63 N.C. L. Rev. 375, 381-82 (1985)(criticizing Roe, stating that "[t]he sweep and detail of the opinion stimulated the mobilization of a right-to-life movement and an attendant reaction in Congress and state legislatures," and that, "[i]n place of the trend 'toward liberalization of abortion statutes' noted in Roe,[] legislatures adopted measures aimed at minimizing the impact of the 1973 rulings, including notification and consent requirements,[] prescriptions for the protection of fetal life,[] and bans on public expenditures for poor women's abortions").

It often goes unrecognized that incorporation of the Second Amendment through the Fourteenth Amendment contravenes two of the Framers' mandates. First, the Second Amendment was not intended to apply to the States, but instead was added for the protection of State militia and State laws that required men to have guns. Second, the Second Amendment intends to leave the power to affect arms, which is denied to Congress, to the State political process. The Second Amendment -- indeed, the Bill of Rights -- does not stake out the furthermost limits of the national government's power, for the Constitution expressly delegates to Congress certain powers, and specifically reserves all other powers to the States and to the people. As a description of the division of the political and legislative power in the Constitution, that principle is beyond dispute. The point of the Second Amendment's second mandate is not that the Second Amendment carves

out a small or large exception from Congress' power, but that it carves out only that much from the political process.

The Court thus proposes three basic premises of Second Amendment analysis. The first is that the Second Amendment protects against federal legislation; the second is that the Second Amendment protects arms that can be used for a rebellion or collective self-defense; and the third is that the Second Amendment provides an individual right to these protected arms. These principles do not prevent States and localities from regulating arms in a manner that Congress cannot. This plausible interpretation of the Second Amendment is not the only legitimate source of justification for the suggested principles, for there are pragmatic and institutional concerns which compel its acceptance.

Incorporation of the Second Amendment, then, implies that it is no longer of Second Amendment concern where that residual majoritarian power lies. The Framers' division of powers between the States and the federal government is now irrelevant to Second Amendment analysis and its limitations now apply to all government action equally.

The issue now is simply what are those limitations. The Supreme Court should be slow to move the limitations placed on Congress to the States, because the limits on the national government are for a different purpose. The Supreme Court has told the nation, however, that who is acting is irrelevant. The universal limitation is now on the majoritarian will in every State, and that limitation on Congress was intended to be great. Hence, incorporation decreases majoritarian powers in States when the Second Amendment was designed to protect what was going on in the States from the new national government. Moreover, to make the check on all governments more palatable, the Supreme Court now limits the check to just weapons that are for self-defense, rather than arms needed to express the right to rebel or protect collectively against the national government. With this new limitation on the Second Amendment, Congress is no longer constrained by a broad reading of the Second Amendment permitted when the division between the States and Congress is maintained. The flaw in the Supreme Court's Second Amendment analysis is that it ignores that the Framers intended the political power to regulate firearms to lay somewhere and not disappear, but did not intend it to rest with the national government. The Supreme Court does not acknowledge that incorporation means that the majority of the democratic process no longer makes the decision and, by making State and local regulations a Constitutional issue, the Supreme Court appropriates that decision making to itself. Even if, however, the Court agrees with the Supreme Court -- as the Court as an inferior Court must -- that the Second Amendment equally limits Congress and the States, structural analysis still can be helpful in determining the extent of those limitations.

Finally, the Court wants to make a sympathetic rebuttal to the best policy reason for applying the Second Amendment to the States. Justice Thomas, in his partial concurrence in McDonald v. City of Chicago, Ill., 561 U.S. at 805-58 (Thomas, J., concurring in part), makes an impassioned argument that, in the early nineteenth century through Reconstruction, many southern States restricted both enslaved and free African Americans from possessing firearms, leaving African Americans at the mercy of whites who had guns, see 561 U.S. at 843-47 (Thomas, J., concurring in part). He is indisputably correct, and it is also the case that the modern federal gun legislation was prompted in part by Americans, and especially anxious white Americans, seeing armed Black militants on their television screens during the late 1960s and 1970s. See Nicholas J. Johnson, Firearms Policy and the Black Community: An Assessment of the Modern Orthodoxy, 45 Conn. L. Rev. 1491, 1566-67 (2013)("With cities burning and black radicals preaching violent

- 44 -

issue in that case -- handguns -- are "Arms" under the Second Amendment's plain text by stating: "Nor does any party dispute that handguns are weapons 'in common use' today for self-defense." Bruen, 597 U.S. at 32 (quoting Heller, 554 U.S. at 627).  In terms of analytical methodology, this language suggests that the proper test for whether a device, object, or weapon is an "Arm[]" under the Second Amendment involves asking whether that device, object, or weapon is "'in common use' today for self-defense." Bruen, 597 U.S. at 32 (quoting Heller, 554 U.S. at 627).  Accordingly, most federal cases post-Bruen have taken this language as a command that "in common use" analysis should be undertaken as part of a court's step-one, plain-text analysis under Bruen.   See United States v. Berger, No. CR 22-0033, 2024 WL 449247, at *3 (E.D. Pa. February 6, 2024)(Leeson Jr., J.)(noting that, "[f]ollowing Bruen, most federal courts considering Second Amendment challenges address the common-use issue at step one of the analysis," and collecting cases).

The Court notes, however, that this approach is not logically obvious, and academic commentary has questioned the idea that the in-common-use test comes at the Bruen inquiry's step one, rather step two.  Broadly speaking, the thrust of these criticisms is that the "in common use"

---

revolution, politicians and editorialists called for stricter gun legislation as a way to disarm the ghettos.").  Nevertheless, the Second Amendment is not -- and should not be -- the primary vehicle by which to combat State-level discriminatory disarming practices.  The Second Amendment is a mighty check on Congress' power, and the modern Equal Protection Clause should keep States from disarming only one group on the basis of race.  The nation does not need the Second Amendment to protect African Americans from being systematically discriminated against.  The Civil Rights laws, and other Constitutional protections, are better suited to combat the issues that arise from discriminatory disarming.  While the Court has tremendous respect for Justice Thomas as an originalist and as a creative thinker, and shares his disgust for the lack of protection for African-Americans in the South against White brutality after the Civil War, there is not much evidence that a Second Amendment applied to the States would have prevented what occurred during that time period.  A collective lack of national will to maintain African-Americans within the political system at the State level was the overall culprit, and there were plenty of laws -- such as laws against murder -- that the nation chose not to enforce during that time.

question is, itself, rooted in historical inquiry -- which makes step two of the <u>Bruen</u> analysis a better fit for its consideration.  <u>See</u> Jamie G. McWilliam, <u>The Relevance of "In Common Use"</u> <u>After</u> Bruen, 37 Harvard J. L. & Pub. Pol'y (Per Curiam) 2 (2023)("[T]he common use standard was born of history, not the text of the Second Amendment, and considerations of historical tradition arise at <u>Bruen</u>'s step two, not step one.").  This criticism has some undeniable intuitive appeal -- indeed, the phrase "in common use" has its high-court origin in <u>Miller</u>, in which the Supreme Court discusses the historical meaning of the term "Militia" in the Second Amendment:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators.  These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense.  "A body of citizens enrolled for military discipline."  And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

<u>Miller</u>, 307 U.S. at 179 (source of quoted material not cited).  The Supreme Court in <u>Heller</u> picks up on this language and uses it to explain "*what* types of weapons *Miller* permits":

> We may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits.  Read in isolation, *Miller*'s phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939.  We think that *Miller*'s "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."  307 U.S., at 179 . . . . The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense.  "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same."  *State v. Kessler,* 289 Ore. 359, 368, 614 P.2d 94, 98 (1980)(citing G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254 (1973)).  Indeed, that is precisely the way in which the Second Amendment's operative clause furthers the purpose announced in its preface.  We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for

> lawful purposes, such as short-barreled shotguns.  That accords with the historical
> understanding of the scope of the right, see Part III, *infra*.

Heller, 554 U.S. 624-25 (emphasis in Heller)(footnotes omitted).  In this passage, the Supreme

Court conducts a historical analysis to determine that the "Arms" protected by the Second

Amendment are those that, for "traditional" militiamen, were "'in common use at the time' for

lawful purposes like self-defense."  Heller, 554 U.S. 624.  This inquiry is, in some unavoidable

sense, historical, and thus arguably should belong at step two of the Bruen analysis, in which courts

consider "the Nation's historical tradition of firearm regulation."  597 U.S. at 24.  See McWilliam,

The Relevance of "In Common Use" After Bruen at 1 ("The Supreme Court has consistently

maintained that the common use standard arises from the 'historical tradition of prohibiting the

carrying of dangerous and unusual weapons.'" (quoting Heller, 554 U.S. at 627)).  In a similar

vein, the United States Court of Appeals for the Ninth Circuit has concluded that the question

whether a particular weapon is "dangerous and unusual" belongs at step two of the Bruen analysis,

because "*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies

in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons,'" and,

"[i]t did not say that dangerous and unusual weapons are not *arms*."  Teter v. Lopez, 76 F.4th at

949-50 (quoting Heller, 554 U.S. at 627)(emphasis in Teter v. Lopez, but not in Heller).  See also

Bevis v. City of Naperville, 85 F.4th at 1198 (observing that, "[t]here is no consensus on whether

the common-use issue belongs at *Bruen* step one or *Bruen* step two," but assuming, without

deciding, "that this is a step two inquiry"); id. at 1199 (noting that "the idea of 'common use'

cannot be severed from the historical scope of the common-law right that the Second Amendment

was designed to protect against encroachment," and, thus, "the relevant question is what are the

modern analogues to the weapons people used for individual self-defense in 1791, and perhaps as

late as 1868").

Despite these arguments, the Court nevertheless concludes that it should consider whether a given weapon is "'in common use' today for self-defense" as part of the step one, plain text analysis under Bruen.  597 U.S. at 32 (quoting Heller, 554 U.S. at 627).  The Court's rationale for adopting this methodological approach is straightforward: it is the methodological approach that the Supreme Court used in Bruen.  See 597 U.S. at 32.  The Court will not presume that the Supreme Court's approach to the Bruen analysis -- in Bruen itself -- to be careless or casual.  As the Honorable Joseph F. Leeson, Jr., United States District Judge for the Eastern District of Pennsylvania, notes: "[I]t is impossible to ignore that the author of the Bruen Majority Opinion, Justice Clarence Thomas, when applying the Second Amendment constitutionality standard he had thoroughly explained, addressed whether 'handguns are weapons "in common use" today for self-defense' at step one of the analysis."  United States v. Berger, 2024 WL 449247, at *6 (quoting Bruen, 597 U.S. at 32).  Judge Leeson reflects that he "has no reason to believe that this happened accidentally," and the Court is, likewise, unable to come up with one.  While the Court thoroughly enjoys and appreciates all that the academic commentary does to foster our jurisprudence and legal discourse, in the end, the Court is an inferior court, and must apply the Supreme Court's rules as the Court best understands them.  Accordingly, the Court concludes that, to fall under the plain text of the Second Amendment's term "Arms," the device, object, or weapon must be "'in common use' today for self-defense."  Bruen, 597 U.S. at 32 (quoting Heller, 554 U.S. at 627).

Applying this standard, the Court concludes that Teston's pipe bomb is not a weapon that that is in common use today for self-defense, and it thus does not fall under the Second Amendment's plain text.  The Court recognizes that "common use" is a "slippery concept," Bevis v. City of Naperville, 85 F.4th at 1198, and, to date, no court has applied the Bruen step one test to a pipe bomb or any kind of "destructive device" as 26 U.S.C. § 5845(f) defines that term, see

United States v. Sredl, 2023 WL 3597715, at *3 (concluding that "there is no Second Amendment right to possess dangerous and unusual weapons in the form of 'destructive devices,'" but not explicitly stating which step in the Bruen analysis mandates this conclusion).  Nevertheless, the Court concludes that a pipe bomb is not in common use today for self-defense.  A pipe bomb is single use, unpredictable, unwieldly, and dangerous even to the individual who deploys it.  As a point of contrast, Teston's destructive device shares very few features with a handgun, which the Supreme Court has called "the quintessential self-defense weapon": for example, a pipe bomb cannot feasibly "be pointed at a burglar with one hand while the other hand dials the police." Heller, 554 U.S. at 629.  Moreover, and with greater relevance to the Court's historical understanding of the Second Amendment, see note 11, supra, at 40, Teston's destructive device is also not a weapon that one would "expect (or allow) citizens to bring with them when the militia is called to service," or to participate in overthrowing a tyrannous government.  Friedman v. City of Highland Park, Illinois, 784 F.3d 406, 408 (7th Cir. 2015)(Easterbrook, J.).  Moreover, pipe bombs and other 26 U.S.C. § 5845(f) destructive devices are more akin to short-barreled shotguns, which Heller concludes do not fall within the Second Amendment's scope -- in part because they are not weapons that are in common use today for self-defense.  See Heller, 554 U.S. 624-25. Again, although no case to date has considered explicitly whether pipe bombs or other 26 U.S.C. § 5845(f) destructive devices are Second Amendment "Arms" under the step one analysis that Bruen requires, it is notable that no case -- regardless of its analytical methodology -- has found that "destructive devices" under 26 U.S.C. § 5845(f) fall under the scope of the Second Amendment's protections.  See Tagg, 572 F.3d at 1326; United States v. Sredl, 2023 WL 3597715, at *3.

In sum, the Court concludes that "the Second Amendment's plain text" does not cover Teston's conduct.  Bruen, 597 U.S. at 24.  First, the Court concludes that Teston is part of "the people" for the purpose of the provision's plain text, because the most direct guidance provided by the Supreme Court -- provided in Heller -- indicates that this term should be read broadly to apply to all people in the political community.  Heller, 554 U.S. at 580-81.  Next, however, the Court concludes that Teston's destructive device is not an "Arm[]" for the Second Amendment's purposes, because it is not "'in common use' today for self-defense."  Bruen, 597 U.S. at 32 (quoting Heller, 554 U.S. at 627).  Because Teston's argument fails at step one of the Bruen analysis, the Court disagrees with the first of Teston's arguments regarding the Second Amendment.

> **B.     TENTH CIRCUIT CASE LAW PROHIBITS THE USE OF THE CATEGORICAL APPROACH TO ASSESSING THE CONSTITUTIONALITY OF FELON DISPOSSESSION STATUTES, AND THUS THE VIOLENT OR NONVIOLENT NATURE OF TESTON'S PRIOR FELONIES ARE OF NO CONSEQUENCE IN DETERMINING WHETHER HIS CHARGE UNDER 18 U.S.C. § 842(i) IS PERMISSIBLE UNDER THE SECOND AMENDMENT.**

The Court concludes that Teston's second argument under the Second Amendment also lacks merit under Tenth Circuit law.  As discussed above, in his alternative argument, Teston asks the Court to adopt an "elements-based . . . categorical approach" to assessing the Constitutionality of felon-in-possession statutes.  MTD Reply at 5-6 (citing Mathis v. United States, 579 U.S. at 512).  Under this analysis, Teston argues, he is a non-violent felon because his crime does not "categorically require violence."  MTD Reply at 5-6.  The result -- under his proposed rule -- is that restrictions on felon firearm ownership that are rooted in rationales related to the dangerousness of felons are unconstitutional as applied to him.  See MTD Reply at 5-6.

As discussed above, see Law Regarding the Second Amendment, supra at 31-32, the Tenth Circuit recently assessed a post-Bruen challenge to a felon in possession charge in which the underlying felony was nonviolent.  See Vincent, 80 F.4th at 1199-1200.  In Vincent, an individual previously convicted of the nonviolent felony of bank fraud argued that, following Bruen, 18 U.S.C. § 922(g) -- which prohibits the possession of firearms by convicted felons -- "violates the Second Amendment rights of nonviolent felons like herself."  Vincent, 80 F.4th at 1199.  The Tenth Circuit declined to take a case-by-case approach that would assess the violent or nonviolent nature of the underlying felony to determine the constitutionality of the charge.  80 F.4th at 1202. The Tenth Circuit reaches this conclusion on the basis of prior case law: in essence, an earlier Tenth Circuit case, United States v. McCane, 573 F.3d at 1047, which the Tenth Circuit in Vincent held that Bruen had not abrogated, had "upheld the constitutionality of the federal ban for *any* convicted felon's possession of a firearm," Vincent, 80 F.4th at 1202 (emphasis in Vincent). Accordingly, the Tenth Circuit in Vincent stated that, "we have no basis to draw constitutional distinctions based on the type of felony involved."  80 F.4th at 1202.

Although Vincent involves 18 U.S.C. § 922(g)(1), and Teston's case involves a separate felon-in-possession statute -- 18 U.S.C. § 842(i) -- the Court concludes that Vincent controls this issue and thus that Teston's charge of felon in possession of explosives is Constitutional under the Second Amendment.  The Court reaches this conclusion because the two statutes are substantially similar -- both textually and in terms of their apparent purpose -- and there is no coherent reason to assume that charges under 18 U.S.C. § 842(i) would receive greater Constitutional protection under the Second Amendment than charges under 18 U.S.C. § 922(g)(1).  Accordingly, Teston's alternative Second Amendment argument is unpersuasive.

To support this conclusion, the Court compares the two statutes.   First, 18 U.S.C. § 922(g)(1).  This statute was originally enacted as part of the Gun Control Act of 1968, Pub. L. No. 90-618, § 922, 82 Stat. 1213, 1220 (1970).   As originally enacted, the statute read, in relevant part:

> (h)     It shall be unlawful for any person --
>
>     (1)     who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
>     . . . .
>
> to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Pub. L. No. 90-618, § 922(h), 82 Stat. 1213, 1220-21 (1970).

Second, Congress originally enacted 18 U.S.C. § 842(i) two years after the Gun Control Act of 1968, as part of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1102, 84 Stat. 952, 955 (1970).  In its original form, the statute read, in relevant part:

> (h)     It shall be unlawful for any person --
>
>     (1)     who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
>     . . . .
>
> to . . . receive any explosive which has been shipped or transported in interstate or foreign commerce.

Pub. L. No. 91-452, § 1102, 84 Stat. 952, 955 (1970).

In their original form, the statutes were nearly identical as pertains to prohibiting felon possession of firearms, ammunition, and explosives.   Although Teston argues that "the two statutory schemes had different aims, and are not grounded in the same historical justification,"

Second MTD at 5, the Court finds no authority to support this argument.  Indeed, in addition to the close textual similarity between the two statutes as originally enacted, the Congressional record indicates that Title XI of the Organized Crime Control Act of 1970 -- of which the statute in question is a part -- was "patterned" on the Gun Control Act of 1968.   H.R. Rep. No. 91-1549, at 38 (1970).  To this day, the two statutes, in relevant part, use almost identical language.  In relevant part, 18 U.S.C. § 922(g)(1) reads:

> **(g)**     It shall be unlawful for any person --
>
> > **(1)**     who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> > . . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).  18 U.S.C. § 842(i) reads, in relevant part:

> **(i)**     It shall be unlawful for any person --
>
> > **(1)**     who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> > . . . .
>
> to ship or transport any explosive in or affecting interstate or foreign commerce or to receive or possess any explosive which has been shipped or transported in or affecting interstate or foreign commerce.

18 U.S.C. § 842(i).   See United States v. Ressam, 553 U.S. 272, 275 (2008)(construing an explosive-related provision in the of the Organized Crime Control Act of 1970 alongside its firearm-related counterpart in the Gun Control Act of 1968).

In addition to these textual similarities between the statutes -- both as enacted and in their current form -- the Court can think of no viable reason why the Constitution would require the

Court to assess categorically the underlying felony for a charge under 18 U.S.C. § 842(i), but not under 18 U.S.C. § 922(g)(1). Indeed, the latter of these two statutes regulates "any firearm or ammunition," 18 U.S.C. § 922(g)(1), a category which is arguably more firmly within the Second Amendment's purview than "any explosive," 18 U.S.C. § 842(i). The Court concludes that, because of the close textual similarity between 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 842(i), and because the Court is not persuaded that the Second Amendment provides enhanced constitutional protections for charges under 18 U.S.C. § 842(i), Vincent binds the Court not to consider the nature of Teston's underlying felony when assessing the constitutionality of his charge under 18 U.S.C. § 842(i). Accordingly, the Court disagrees with Teston's alternative Second Amendment argument.[12]

_____

[12]Even in the absence of Vincent, the Court would be loath to adopt Teston's proffered categorical approach to assess the as-applied Constitutionality of 18 U.S.C. § 842(i). The Court has expressed previously its skepticism about the categorical approach in other, non-Constitutional, criminal law contexts, see, e.g., United States v. Young, No. CR 17-0694, 2021 WL 534869, at *26 n.10 (D.N.M. February 11, 2021)(Browning, J.), and the Court is not alone in this skepticism; the categorical approach has many critics. The categorial approach's conventional application, which is used to determine whether the underlying act of a criminal wrongdoing rises to the level of a specific characterization -- e.g., a crime of violence or a crime involving moral turpitude -- instructs courts to look "'only to the fact of conviction and the statutory definition of the prior offense, and . . . not [to] generally consider the particular facts disclosed by the record of conviction.'" United States v. Bowen, 936 F.3d at 1102 (quoting United States v. Serafin, 562 F.3d 1105, 1107-08 (10th Cir. 2009))(quotations omitted in original). The approach's focus on statutory convictions rather than on actual conduct has led some judges to characterize it as a "judicial charade," Ovalles v. United States, 905 F.3d 1231, 1253 (11th Cir. 2018)(Pryor, J., concurring), and note that the categorical approach "require[s] that judges ignore the real world," United States v. Chapman, 866 F.3d 129, 136 (3d Cir. 2017)(Jordan, J., concurring). Justice Thomas calls the approach "an absurdity." Quarles v. United States, 139 S. Ct. 1872, 1880 (2019)(Thomas, J., concurring). The Honorable J. Harvie Wilkinson III, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, describes the categorical approach as "a protracted ruse for paradoxically finding even the worst and most violent offenses not to constitute crimes of violence," United States v. Doctor, 842 F.3d 306, 313 (4th Cir. 2016)(Wilkinson, J., concurring), and pleads: "Heaven help us," United States v. McCollum, 885 F.3d 300, 314 (4th Cir. 2018)(Wilkinson, J., dissenting).

Moreover, while Congress often imposes the categorical approach by statute, see United States v. Davis, 139 S. Ct. 2319, 2328 (2019)("It's not even close; the statutory text commands

- 54 -

II.    **THE COURT DISAGREES WITH TESTON'S ARGUMENT REGARDING THE SUBJECTIVE INTENT RELATED TO HIS DESTRUCTIVE DEVICE, BECAUSE THE UNITED STATES IS NO LONGER PROCEEDING ON ITS 26 U.S.C. § 5845(f)(3) THEORY, AND THE COURT HOLDS THAT 26 U.S.C. § 5845(f)(1) REQUIRES NO PROOF OF SUBJECTIVE INTENT.**

Teston next contends that Count 2 and Count 3 fail to state an offense, because, to sustain a conviction on these allegations, the United States must -- but cannot, according to Teston -- demonstrate Teston's intent to use the explosive materials as a weapon.  See Second MTD at 7-13.  This argument, which the Court outlines in greater detail above, see Procedural History Section 1, supra at 9-10, is premised on the idea that Teston is being charged, in relevant part, under 26 U.S.C. § 5845(f)(3)'s definition of a "destructive device."  Under 26 U.S.C. § 5845(f)(3), Teston

---

the categorical approach."), in the absence of specific instruction from a higher court, the Court is reluctant to impose this morass of confusion onto Second Amendment jurisprudence.  Moreover, to the extent that Teston's prior criminal convictions would not qualify as a "crime of violence" pursuant to 18 U.S.C. § 924, Teston's circumstances seem to be one of those that would require the Court to "ignore the real world."  United States v. Chapman, 866 F.3d at 136.  Indeed, Teston's criminal history indicates that he was convicted of aggravated assault with a deadly weapon, in which Teston struck his ex-girlfriend with a knife, leaving her with injuries to her chest area and face.  See Presentence Investigation Report ¶ 37, at 11, filed July 19, 2023 (Doc. 117).

Beyond these general criticisms of the categorical approach, as a Constitutional matter, the Court concludes that the Supreme Court's Second Amendment precedents support the across-the-board restrictions on felons -- not just some felons.  As the Supreme Court notes in Heller, the right conferred by the Second Amendment is a "right of law-abiding, responsible citizens," 554 U.S. at 635, and the Supreme Court explicitly stated that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "examples" of "presumptively lawful regulatory measures" that do not offend the Second Amendment, 554 U.S. at 626; id. at 627 n.26.  Bruen reaffirmed these understandings, stating that "ordinary, law-abiding citizens have a . . . right to carry handguns publicly for their self-defense."  597 U.S. at 9.  While there may be some indeterminacy at the margins about the meaning of "law-abiding" for Constitutional purposes, see United States v. Rahimi, 143 S. Ct. 2688 (2023)(cert. granted)(argued November 7, 2023), convicted felons are not "law-abiding, responsible citizens," Heller, 554 U.S. at 635.  See Felony, Black's Law Dictionary (11th ed. 2019)("A serious crime usu. punishable by imprisonment for more than one year or by death.").  If the Supreme Court wants to create a violent/non-violent felony exception to its Second Amendment analysis, that is a task for the Supreme Court to do rather than a district court.  In sum, even without Vincent, the Court concludes that there should be no case-by-case categorical approach to determine the Constitutionality of 18 U.S.C. § 842(i)'s approach to convicted felons.

argues, the United States must show evidence of Teston's subjective intent to use the materials as a weapon, which Teston asserts that United States cannot prove.  See Second MTD at 7-13; 26 U.S.C. § 5845(f)(3) ("The term 'destructive device' means . . .  (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.").  Following the Second Superseding Indictment, however, the United States is no longer proceeding on a theory that Teston's "destructive device" falls within 26 U.S.C. § 5845(f)(3)'s definition.  Indeed, the Second Superseding Indictment removes any mention of 26 U.S.C. § 5845(f)(3), instead relying on 26 U.S.C. § 5845(f)(1)'s definition of "destructive device" to support the allegations against Teston.  See Second Superseding Indictment at 2 (alleging that Teston "knowingly made a firearm . . . that is a destructive device . . . as defined pursuant to 26 U.S.C. §§ 5845(a)(8) and (f)(1)"); 26 U.S.C. § 5845(f)(1) ("The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces . . . .").  Accordingly, to the extent that Teston relies on 26 U.S.C. § 5845(f)(3)'s definition of "destructive device" as a basis to argue that subjective intent is necessary to support his conviction, that argument is no longer viable, because 26 U.S.C. § 5845(f)(3) no longer forms part of the United States' theory of criminal liability.

As for the United States' current theory -- premised on 26 U.S.C. § 5845(f)(1)'s definition of "destructive device" -- in the Subjective Intent MOO, "the Court concludes that, in the Tenth Circuit, the appropriate inquiry into whether a device is not designed as a weapon for purposes of 26 U.S.C. § 5845(f)(1) must focus on the device's objective, physical characteristics, and not on the designer's subjective intent."  Subjective Intent MOO at 22.  Given this conclusion, the Court holds in the Subjective Intent MOO that, given that "Teston's subjective intent in designing the

device is irrelevant for purposes of a claim under 26 U.S.C. § 5845(f)(1), it is inadmissible under rule 402 of the Federal Rules of Evidence."  Subjective Intent MOO at 31 (citing Fed. R. Evid. 402).  The Court reaffirms that conclusion here and therefore concludes that the United States' sole "destructive device" theory in this case does not require any showing of subjective intent.  Accordingly, the Court denies the MTD and the Second MTD's argument that the United States cannot sustain its allegations without evidence of Teston's subjective intent.

### III.  MS. ARMIJO'S CONDUCT IN THE ARMIJO EMAIL DOES NOT RISE TO THE LEVEL OF SUBSTANTIAL INTERFERENCE WITH A POTENTIAL WITNESS, BECAUSE MS. ARMIJO'S REMARKS DID NOT INTIMIDATE OR THREATEN SANCHEZ, AND THERE IS NO INDICATION THAT SANCHEZ' POTENTIAL TESTIMONY WOULD BE FAVORABLE TO TESTON.

Finally, the Court concludes that Ms. Armijo's conduct in sending the Armijo Email does not rise to the level of prosecutorial misconduct that necessitates this case's dismissal.  As noted above, in the Tenth Circuit, to prevail on an allegation of prosecutorial misconduct based on interference with defense witnesses, the defendant must "provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material."  United States v. Allen, 603 F.3d at 1211 (citing Griffin v. Davies, 929 F.2d at 553).  Here, there is no "actual government misconduct in threatening or intimidating potential witnesses."  United States v. Allen, 603 F.3d at 1211.  The Armijo Email, while mildly antagonistic to the Portales Police Department as an entity, is not an "improper method[] calculated to produce a wrongful conviction."  Berger v. United States, 295 U.S. at 88.  Moreover, nothing in the Armijo Email is a threat or intimidation to Sanchez, who was not a recipient of the Armijo Email.  See Factual Background Section 2, supra, at 4-5.  To construe Ms. Armijo's remark that "we may not be taking any cases Federally from PPD unless their officers want to work with us," Armijo Email at 1, as a threat or intimidation

to Sanchez requires considerable speculation that is untethered to any evidence in the record. Moreover, given the conclusion reached in the Subjective Intent MOO, any testimony that Sanchez may provide is limited to the objective qualities of Teston's destructive device, as Sanchez' potential testimony regarding Teston's subjective intent in making the device is irrelevant under rule 402.  See Subjective Intent MOO at 31 (citing Fed. R. Evid. 402).  Accordingly, the Court denies the MTD for Prosecutorial Misconduct.

**IT IS ORDERED** that: (i) the Defendant's Motion to Dismiss the Indictment, filed March 13, 2023 (Doc. 30), is denied; (ii) the Defendant's Motion to Dismiss the Superseding Indictment, filed March 17, 2023 (Doc. 36), is denied; and (iii) the Defendant's Motion to Dismiss With Prejudice for Prosecutorial Misconduct, filed May 5, 2023 (Doc. 98), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alexander M.M. Uballez
  United States Attorney
Maria Ysabel Armijo
Christopher McNair
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Stephen A. Taylor
Martin Juarez
  Assistant Federal Public Defenders

Office of the Federal Public Defender
Albuquerque, New Mexico

*Attorneys for the Defendant*